IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | |
|---|---|
| Andy Lawson McDaniel, | ) C/A No.: 7:23-cv-01527-TMC-JDA |
| | ) |
| Plaintiff, | ) |
| | ) **Expert Report of Brian S. Batterton** |
| | ) |
| v. | ) |
| | ) |
| R. Todd Campbell; Darren M. Janesky; | ) |
| Town of Blacksburg, a/k/a Blacksburg. | ) |
| Police Department; Mayor Mike Patterson; | ) |
| Police Chief Jamie P. Ham; Cherokee County | ) |
| Sheriff's Deputy Mark Hutchens; and | ) |
| Cherokee County Sheriff's Office, | ) |
| | ) |
| Defendants. | ) |

1.      My name is Brian S. Batterton.  I have been actively involved in police practices and law

enforcement since 1994.  I am currently an active police officer at the rank of police major.

2.      My education includes a Bachelor of Science Degree in Criminal Justice from Georgia

State University in Atlanta, Georgia and a Juris Doctor from John Marshall Law School in Atlanta,

Georgia.  I am an active member of the State Bar of Georgia.

3.      I am currently on the Legal and Professional Advisory Board of the Legal and Liability

Risk Management Institute. This organization provides training and other consulting services to

law enforcement agencies throughout the United States.  As part of the Legal and Liability Risk

Management Institute, I conduct policy and legal training for law enforcement agencies and school

officials throughout the United States.  I also author articles related to various law enforcement

topics that are sent to law enforcement officers and school officials throughout the United States.

1



4.     Since 2006, I have conducted numerous training sessions for public employees. Participants in this training have included law enforcement officials, school officials, and attorneys. I have provided training in the following areas:

a.          Policy development for public safety agencies.

b.          Legal Issues in police use of force and use of force training.

c.          Police misconduct/civil liability.

d.          Arrest, Search and Seizure, & Interrogation.

e.          Racial profiling.

f.          Legal issues in public schools.

g.          Constitutional update for law enforcement officers.

h.          Legal/policy and decision-making factors in law enforcement pursuits including use of force/intervention tactics.

5.     I am currently police Major for the Cobb County (GA) Police Department in Marietta, Georgia. I have been employed by the Cobb County Police Department since 1995. During my tenure there, I have served in the following capacities: a patrol officer in the Uniform Patrol Division; a detective in the Detective Bureau; a Corporal in the Training Unit; a sergeant in the Uniform Patrol Division; a sergeant in the Office of the Chief of Police in the capacity of Legal Officer; a lieutenant in the Office of the Chief of Police in the capacity of Adjutant and Legal Officer; as a captain in the capacity of the Administrative Bureau Commander and Legal Officer and as the Police Academy Director for the Cobb County Department of Public Safety Training Center. I am currently a police Major serving in the capacity of Precinct Commander for the Cobb County Police Department.   I have approximately seventy-five (75) officers, to include supervisors, patrol officers and detectives, under my command. During most of my career, I have

2

had an active role in training, particularly regarding issues of criminal procedure and criminal law, use of force, and policy research and development.

6.     Since 2001, I have taught numerous courses at the Cobb County Police Department on criminal procedure, to include Fourth Amendment issues in search and seizure, Fifth and Sixth Amendment issues related to police interviews, interrogation and right to counsel, legal aspects of use of force, pursuits and emergency vehicle operations and police policy and procedure. I have taught these topics to police recruits, veteran patrol officers, detectives, as well as supervisors and command staff.

7.     My job duties as Legal Officer required me to review various disciplinary matters and investigations of police officer misconduct on behalf of the Chief of Police and to provide advice to the Chief on such matters. As the Police Academy Director, I reviewed vehicle pursuits and officers involved uses of force. As a precinct commander, my duties include reviewing the use of force, pursuits, and alleged misconduct by officers under my command for policy and law compliance and to identify training issues.

8.     As a member of the Legal & Liability Risk Management Institute Board of Advisor's, I have researched and assisted in drafting policies for law enforcement agencies relating to high-risk critical tasks including use of force, arrest, search & seizure, pursuit, emergency vehicle operation, special operations, internal affairs, hiring and selection-retention of officers, care-custody-control and restraint of prisoners, sexual harassment-discrimination and sexual misconduct, domestic violence, and dealing with the mentally ill. I have also conducted training on the above topics to various law enforcement officers and school officials nationally.

9.    I also write articles related to law enforcement practice and law for the Public Agency Training Council and the Legal and Liability Risk Management Institute.  Such articles can be found free of charge on the internet at llrmi.com (Legal Liability Risk Management Institute).

10.    In 2009, I was a featured speaker at the South Carolina Municipal Association Conference on the topic of technology used for law enforcement.

11.    Also, relevant to this case, I completed a Use of Force Instructor Training Program in 2012 at Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia.  Additionally, I regularly teach use of force considerations and law to police officers, and I have been certified as a Taser Instructor and user.

12.    My experience, training and background are more fully described in the attached curriculum vitae, which I incorporate by reference to this report.

13.    I have reviewed the following materials to date regarding this case:

    a.  Filed Summons and Complaint
    b.  7-Filed Answer
    c.  14-Answer of Cherokee Co.
    d.  Arrest Warrant
    e.  BPD Incident Report
    f.  CCSO Incident Reports for McDaniel
    g.  CFS Suspicious Vehicle
    h.  911 Call to Cherokee Co Dispatch RE Suspicious Vehicle
    i.  7H00123_Brav11_10242021030301_0004 (000549).MP4 (Officer Campbell BWC)
    j.  10232308_0021 (000550).MP4 (Constable Janesky BWC)
    k.  2022 Investigation Docs
    l.  Expert Report of Anthony Morton (Plaintiff's expert)
    m.  Andy McDaniel - Cherokee Medical Center in Gaffney_001 to 065.pdf
    n.  Drug Screen – Spartanburg Medical Center
    o.  Blacksburg FOIA__001 to 039.pdf
    p.  Campbell docs.pdf
    q.  Officer Campbell Deposition
    r.  Constable Janesky Deposition
    s.  Andy McDaniel Deposition
    t.  CFS MVA Incident 10-23-21.pdf
    u.  CFS Suspicious Vehicle 10-23-21.pdf

4

    v.  City FOIA Response.pdf
    w.  Constable authority atty gen opinion.pdf (SC Attorney General Opinion, April 24, 1997, Robert D. Cook, Dep. Asst. Attorney General)
    x.  FOIA - AG Records.pdf
    y.  McDaniel-Campbell docs.pdf
    z.  McDaniel-case file.pdf
    aa. McDaniel-SLED file.pdf
    bb. McDaniel-Todd Campbell.pdf
    cc. McDaniel.pdf
    dd. Town of Blacksburg Police Dept. Policies: Body Worn Camera, Internal Affairs/Citizen Complaint, Motor Vehicle Stops/Searches, Response to Resistance, Stop Arrest and Search of Persons, Training Directive
    ee. SLED Case #34-21-0195 - Investigative Report  Paper Attachments_Redact.pdf
    ff.  SLED Check.pdf
    gg. Video of SLED interview with Officer Campbell
    hh. Video of SLED interview with Constable Janesky
    ii.  Case Jacket Contents (Case Status Reports, Sol's Letter, etc.) - SLED Case #34-21-0195

14.    My opinions expressed in this report are based upon the materials provided and reviewed to this date. The opinions presented in this report are based upon my specialized experience, training and knowledge of police practices as well as my education and continued research and work with law enforcement nationally. This work includes conducting training for law enforcement around the United States. My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration, supervision and command. I am familiar with police civil litigation and know the normal phases of discovery. With this in mind, I recognize that there may be additional documentation as the case progresses. In the event that additional material is produced, I shall be prepared to supplement this report.

15.    The facts relied upon to author this report are based upon the video recordings of the incident, as well as a combination of the materials reviewed above and, as much as possible, I specifically avoid drawing conclusions based upon credibility of the parties. However, if a

statement from a witness is contradicted by video evidence, I consider video evidence more reliable, to the extent it clearly depicts the events described. When additional facts are developed in this case, I shall be prepared to supplement this report, if necessary.

16.     A summary of facts are as follows:

a.        On or about October 23, 2021, at approximately 1948 hours, a red pick-up truck, travelling westbound on Cherokee Street in the Town of Blacksburg (SC), crashed into the rear of a Kawasaki motorcycle ridden by Michael Green, which was also westbound on Cherokee Street. The truck fled the scene of the crash.

b.        State Constable Janesky, who was working with the Town of Blacksburg Police Department at this time, was parked nearby and heard a loud noise which included the sound of breaking plastic. (Janesky Deposition at 78). Constable Janesky responded to the scene and saw a male laying on the ground, not moving. (Id. at 79). Officer Shanna Blanton, who was working near the museum, also responded to the crash. Constable Janesky heard people in a crowd yelling "call 911" and others were telling him that the suspect vehicle was a red truck with "stuff" in the back. (Id.).

c.        Blacksburg Police Officer Campbell also responded to the crash. He was the primary investigating officer for the crash. He spoke to Mr. Green, the rider of the motorcycle. Officer Campbell stated that Green was "shook up." (Campbell Deposition at 94). He stated that Green was checked by EMS and refused treatment and transport. (Id. at 95). Green told Officer Campbell that "a truck hit him from behind," drove around him, and left the scene. (Id.). Officer Campbell collected a piece of broken plastic and a deer whistle from the grill of the truck that was found at the scene of the crash. This was placed into evidence. (Blacksburg at 229). Officer Blanton took 5 photos of the scene of the crash. (Blacksburg at 196).

6

d.        Constable Janesky left the scene of the crash and drove west on Cherokee Street in an attempt to locate the red truck. He was not able to locate the truck at that time.

e.        A witness notified officers that he followed the truck down South Rutherford Street at a "high rate of speed, driving recklessly." (Blacksburg at 198; see also Campbell Deposition at 123).

f.        Officers received information that the driver of the red truck may have been "Andy McDaniel." Officer Campbell checked this name on CAD to attempt to locate an address for McDaniel.

g.        At approximately 2247 hours, Cherokee County dispatch received a call that a pick-up truck was parked up the road near his residence, at or about 417 Blue Bird Lane. This was outside of the Town of Blacksburg's corporate limits. The CAD report shows that dispatch notified 112 (Lt. Hutchins) of the call, and it shows that the county units were busy at that time. Officer Campbell heard the call and notified Lt. Hutchins that he and Constable Janesky were in the area and asked if he wanted them to handle the call. The response was affirmative.

h.        Officer Campbell and Constable Janesky arrived at Blue Bird Lane. Officer Campbell briefly spoke with the caller to determine the location of the truck. They also received information over the radio that Andy McDaniel was known to fight the police.

i.        Officer Campbell and Constable Janesky then drove to the location of the truck. As they approached the red truck, they saw a white male slumped over on the driver's side. (Janesky BWC at 00:00). Officer Campbell observed that the truck had a broken grill and a deer whistle was missing. (Campbell Deposition at 113; Blacksburg at 194).

j.        Officer Campbell and Constable Janesky began telling the male, later identified as Andy McDaniel, to "open the door," and "police, open the door." (Janesky BWC at 00:00-00:42).

7

McDaniel was given at least nine such commands, and McDaniel refused to comply. Constable Janesky attempted to break the window to the truck with his flashlight but the light broke. He then looked in the bed of the truck and located a small sledge hammer, or maul. Constable Janesky warned McDaniel he would break the window. McDaniel did not open the door. Constable Janesky then used the maul to break the driver's door window. (Id. at 00:42).

k.        Officer Campbell is heard twice telling McDaniel, "Let me see your hands". (Id. at 00:44). Constable Janesky stated in his deposition that when he opened the door, McDaniel "immediately clutched the steering wheel with both hands." (Janesky Deposition at 86). When he grabbed McDaniel's left arm to pull him from the vehicle, he continued to hold the steering wheel with his right hand. (Id.). Janesky said that he pulled him "as hard as he could" and they both went to the ground outside the truck. (Id. at 00:51). At 00:08 on Officer Campbell's body camera, Constable Janesky is seen holding McDaniel's left arm attempting to pull him from the vehicle. McDaniel's right arm is seen extending back as Janesky's first attempt to pull him was unsuccessful. (Campbell BWC at 00:08).

l.        At approximately 00:54 on Contstable Janesky's body camera, he is heard telling McDaniel to "put your hands behind your back!" (Janesky BWC at 00:54). Verbal commands such as "stop resisting" and "give me your other hand" are heard repeatedly as Constable Janesky struggled to handcuff McDaniel. At approximately 00:58 on Janesky's body camera, McDaniel appears to be face down on the ground, with his back visible on camera. At approximately 1:08 on Janesky's body camera, McDaniel appears to be on his side. At 00:27-28 on Officer Campbell's body camera, McDaniel can be seen on his side as officers order him to "stop resisting." (Campbell BWC at 00:27-28). Constable Janesky reported that McDaniel "used his arms and legs to attempt to get free and continually rolled over." (Blacksburg at 195 – Janesky Supporting Report). Officer

8

Campbell was holding his flashlight to provide light. He reached down and assisted Constable Janesky in securing one of McDaniel's arms as Janesky secured the handcuffs on McDaniel. (Janesky BWC at 1:30; Campbell BWC at 00:55).

m.    At approximately 2:24 on Constable Janesky's body camera, an officer helped McDaniel sit up. At approximately 3:12, McDaniel asked for an ambulance and an officer is heard telling him that one his coming.

n.    Lt. Hutchins and Deputy Allen from the Cherokee County Sheriff's Office also responded to the scene. McDaniel had already been handcuffed at this point.

o.    At approximately 4:45 on Janesky's body camera, Officer Campbell tells McDaniel he is under arrest and advises him of his rights under Miranda. At approximately 6:40, McDaniel, in effect, admitted that he hit a motorcycle and left the scene because he was scared.

p.    EMS arrived and checked McDaniel. They advised they needed to transport him to Cherokee Medical Center. Constable Janesky rode in the ambulance with McDaniel.

q.    At the hospital, the medical staff notified Constable Janesky that McDaniel had numerous broken ribs on the front and back, a lacerated spleen and contusions to his lungs. (Blacksburg at 262 – SLED Investigation).

r.    Constable Janesky asked the doctor how he could have sustained those injuries. Medical staff said that the injuries could be cause by hitting the steering wheel in a crash, although it was not clear if that referred to all of his injuries. (Blacksburg at 261 – SLED Investigation). McDaniel had told Janesky that earlier that day he crashed into a pole or something similar and hit the steering wheel.

s.    McDaniel tested positive for amphetamines and cannabinoids. (Id. at 262; Drug Screen – Spartanburg Medical Center).

9

t.        McDaniel was issued a traffic citation for hit and run. It was later dismissed and warrant was obtained for the same charge.

u.        On or about September 8, 2022, Jason Bridges, an Assistant Attorney General, wrote a letter to SLED Agent Johnson stating that, after a review of the investigation, there was insufficient evidence to merit criminal prosecution. (Case Jacket Contents (Case Status Reports, Sol's Letter, etc.) - SLED Case #34-21-0195).

**Opinion: The hit and run investigation was conducted in accordance generally accepted police practice.**

17.    It is my opinion, based on my background, training, experience as a police officer, experience as a detective, experience as a police supervisor, experience as a police commander, instructor, education, and continued research, writing, and training, that the hit and run investigation was conducted in accordance with generally accepted police practice. I base this opinion on the following:

a. Law enforcement officers are trained regarding traffic accident investigations. Specifically, they are trained that, when investigating a traffic accident, the investigating officer should do the following: (1) determine if there are injured persons and have EMS come to the scene, if so; (2) speak separately to the involved driver's and ask what occurred; (3) secure relevant physical evidence from the scene; (4) speak to witnesses and ask what occurred; (5) if a hit and run occurred, attempt to obtain a description of the suspect vehicle and driver and have officers check the area; (6) photograph and/or video the scene, if relevant; (7) complete the state form used for traffic crash reporting, and (8) issue proper citation(s) or make an arrest, if warranted.

b. In the case at hand, Officers Campbell and Blanton and Constable Janesky went to the scene of the crash. Officer Campbell was the primary investigating officer. First, EMS was called to check Mr. Green, the rider of the motorcycle that was struck. Second, Officer Campbell asked him what occurred. Third, Officer Campbell collected piece of the suspect truck's grill and a deer whistle that broke off of the grill. This was placed into evidence. Fourth, the officers spoke to numerous witnesses on scene and received phone calls from witnesses. Such witnesses told them that the suspect was in a red truck, it drove on South Rutherford, it sped away at a high rate of speed in a reckless manner, and it may have been driven by Andy McDaniel. Fifth, since a hit and run occurred, Constable Janesky, and later Officer Campbell searched for the truck and suspect. Sixth, Officer Blanton photographed the scene. Later, Officer Campbell photographed McDaniel's truck. Seventh, Officer Campbell completed the state form for traffic crash reporting. Eighth, Officer Campbell issued McDaniel a citation for hit and run under South Carolina statute (*§ 56-05-1220*).

c. Therefore, it is my opinion that Officer Campbell and the other officers investigated the crash/hit and run in accordance with generally accepted police practice.

> **Opinion: A reasonable and well-trained state constable would be consistent with generally accepted police practice and training in believing he was within his authority as a state constable when he attempted to detain McDaniel outside of the town limits in furtherance of the hit and run investigation.**

**18.**     It is my opinion, based on my background, training, experience as a police officer, experience as a detective, experience as a police supervisor, experience as a police commander,

11

instructor, education, and continued research, writing, and training, that a reasonable and well-trained state constable would be consistent with generally accepted police practice and training in believing he was within his authority as a state constable when he attempted to detain McDaniel in furtherance of the hit and run investigation. This is based on the following:

a.  Generally accepted police practice is, in this instance, determined by training received by law enforcement officers. Law enforcement officers are trained regarding the legal territorial limits of their authority or jurisdiction. A 1997 South Carolina Attorney General's opinion states: *"We have recognized that a state constable is clearly recognized as a state officer, possessing statewide law enforcement authority as a peace officer. Our Supreme Court has stated that constables perform all the duties of law enforcement officer and in particular 'a constable stands on the same footing as a sheriff."* (South Carolina, Office of the Attorney General, April 27, 1997, quoting *State v. Franklin,* 80 S.C. 332, 338, 60 S.E. 953, 955 (1908)).

b.  Constable Janesky stated in his deposition that he attended York Technical College for his state constable training. (Janesky Deposition at 29). He stated that his instructor was an attorney who worked for the York County Sheriff's office. (Id.). Janesky further testified that upon completion of the certification, he received a letter signed by the governor that stated he completed his training and was "authorized to enforce the laws of the State of South Carolina." (Id. at 31).

c.  Constable Janesky, in his deposition testified that he understood that he had statewide arrest authority as a state constable. (Janesky Deposition at 180). He further testified that he had this authority due to his appointment as a state constable rather than as being granted by the department that he was working for. (Id. at 181). Additionally, in his deposition he was asked if his jurisdiction was limited to the town limits of Blacksburg. Constable Janesky replied, *"Yes. But*

*our jurisdiction as, as a state constable, overlaps, . . . to the boundaries within the state, as far as having the authority to enforce the law and initiate arrests.*" (Id. at 64).

d. Based upon the information in subparagraphs (a) through (c), a reasonable and well-trained constable could believe he was acting consistent with generally accepted police practice and training in believing he was within his authority as a state constable when he attempted to detain McDaniel outside of the town limits in furtherance of the hit and run investigation.

> **Opinion: A reasonable and well-trained officer in the position of Officer Campbell and Constable Janesky would be consistent with generally accepted police practice and training in believing that they had sufficient grounds to detain McDaniel to investigate the hit and run.**

19.    It is my opinion, based on my background, training, experience as a police officer, experience as a detective, experience as a police supervisor, experience as a police commander, instructor, education, and continued research, writing, and training, that a reasonable and well-trained officer in the position of Officer Campbell and Constable Janesky would be consistent with generally accepted police practice and training in believing that they had sufficient grounds to detain McDaniel to investigate the hit and run. This is based on the following:

    a.    Officers are trained that they need, at a minimum, reasonable suspicion of criminal activity or a traffic law violation to conduct a traffic stop or investigative detention. Officers are taught that "reasonable suspicion" is generally defined *as specific, articulable facts, based on an officer's knowledge, training and experience, that would lead a reasonable officer to believe that criminal activity is afoot. (Terry v. Ohio,* 392

U.S. 1 (1968)). Officers are also trained that probable cause, which is a higher legal standard than reasonable suspicion, will also justify a traffic stop.

b. Law enforcement officers are trained that probable cause is required to make and arrest or to obtain an arrest or search warrant. They are further trained that *"Probable cause exists where "the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed."* (*Brinegar v. United States*, 338 U.S. 160, 179 (1949)(citing *Carroll v. United States*, 267 U.S. 132, 162 (1925)). Additionally, officers are also trained that *"The focus in determining probable cause is not on the certainty that a crime was committed, but on the likelihood of it."* (*Legal Division Handbook*, Federal Law Enforcement Training Centers Office of Chief Counsel, 2021 Edition, Sec. 18.6.1-2, at P. 403-404).

c. A reasonable and well-trained officer would find the following facts relevant in determining if reasonable suspicion was present:

1. Officers were told by Mr. Green, the rider of the motorcycle that was hit, that a truck had crashed into him from behind, driven around him and fled the scene.

2. Witnesses told officers a description of the truck, particularly a red truck, with items in the back.

3. Officer Campbell located broken pieces of a truck grill and a deer whistle that had broken off the suspect's truck during the crash.

4. At least one person notified an officer and that the driver may be Andy McDaniel.

14

5. Cherokee County dispatch received a call regarding a truck parked on private property on a driveway, off of the road.

6. When Officer Campbell and Constable Janesky arrived to check the truck, they observed a red truck.

7. Officer Campbell noted that it had broken plastic and deer missing deer whistles consistent with those found at the scene of the hit and run.

8. Additionally, there were items in the back of the truck and something protruding out of the back of the bed of the truck.

9. Officer Campbell and Constable Janesky saw a white male slumped over in the driver's seat.

d. *South Carolina Code of Laws § 56-5-1220* states in part, the following: *The driver of a vehicle involved in an accident resulting only in damage to a vehicle which is driven or attended by a person immediately shall stop the vehicle at the scene of the accident or as close to it as possible, but shall return to and in every event shall remain at the scene of the accident until he has fulfilled the requirements of Section 56-5-1230. . . A person who fails to stop or comply with the requirements of this subsection is guilty of a misdemeanor.* In the crash between the motorcycle ridden by Mr. Green and the red truck, the driver of the truck failed to stop and comply with the requirements of South Carolina law.

e. Based on the requirements for driver's involved in vehicular accidents above, the facts contained in subparagraph (c), as well as the legal principles upon which officers are trained, it is my opinion that a reasonable and well-trained officer in the position of Officer Campbell and Constable Janesky would be consistent with generally accepted

15

police practice and training in believing that they had sufficient grounds to detain McDaniel to investigate the hit and run.

**Opinion: The force used to remove McDaniel from the truck and handcuff him was consistent with generally accepted police practice and training.**

20.     It is my opinion, based on my background, training, experience as a police officer, experience as a detective, experience as a police supervisor, experience as a police commander, instructor, education, and continued research, writing, and training, that the force used to remove McDaniel from the truck and handcuff him was consistent with generally accepted police practice and training.  I base this on the following:

*a.*     Law enforcement officers are trained that uses of force must comply with the Fourth Amendment.  They are also trained regarding key United States Supreme Court cases regarding the use of force. Because these cases, as discussed below, are used to train police officers, they set the standard for generally accepted police practices regarding use of force.

b.     Generally accepted police practice regarding the use of force centers upon the three factors as outlined by the Supreme Court of the United States in *Graham v. Connor.* (*490 U.S. 386 (1989)).* Officers must consider (1) the severity of the crime at issue, (2) whether the suspect posed a threat to the officer or others, and (3) whether the suspect was actively resisting or attempting to evade arrest by flight.  Additionally, the Supreme Court noted that one must consider that officers are required to make split second decisions in tense, rapidly evolving circumstances. Further, the Court noted that uses of force should not be viewed with 20/20 hindsight. (*Id.*).

16

c.     Law enforcement officers are also trained that *"the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."* (*Id.*).

d.     Applying the factors from *Graham* to the incident with McDaniel, Constable Janesky and Officer Campbell acted in accordance with generally accepted police practice by breaking McDaniel's truck window, pulling him from the vehicle, and handcuffing him.

e.     Graham Analysis – First Factor.

> 1.  Considering the seriousness of the crime at issue, the crime for which McDaniel was initially suspected was *South Carolina Code of Laws § 56-5-1220* (Hit and Run).
>
> 2.  Additionally, Constable Janesky and Officer Campbell, while wearing uniforms that identified them as police, verbally told McDaniel they were police and to exit the truck. McDaniel refused at least nine such commands. Constable Janesky broke his truck window, opened his door and attempted to pull him from the vehicle to handcuff him. Constable Janesky reported that McDaniel hung onto the steering wheel with his right hand and resisted being pulled from the truck. Once on the ground, Constable Janesky and Officer Campbell stated that McDaniel resisted being handcuffed by rolling around, using his arms and legs, and tensing his arms against handcuffing. *South Carolina Code of Laws § 16-9-320(A)* states, in part, the following: *"It is unlawful for a person knowingly and wilfully to oppose or resist a law enforcement officer in serving, executing, or attempting to serve or execute a legal writ or process or to resist an arrest being made by one whom the person knows or reasonably should know is a law enforcement officer, whether under process or not."* Under these facts, a reasonable and well-trained officer to believe would be consistent with generally

17

accepted police practice and training in believing that McDaniel was committing a

violation of *South Carolina Code of Laws § 16-9-320(A)* (Opposing or Resisting).

3.  While these are not felony crimes, they are serious in that a crash involving a truck

versus a motorcycle could easily have cause serious injury, his high-speed, dangerous

flight from the scene (as reported by a witness) and resisting the police also has the

potential for injury.

f.      Graham Analysis – Second Factor. Considering whether McDaniel, posed a threat to the

officers or others, there are several considerations.

1.  First, according to the FBI, Law Enforcement Officers Killed or Assaulted (LEOKA)

website, from 2015-2019, twenty-three (23) law enforcement officers in the United

States were killed[1] and twenty-three-thousand-one-hundred-sixty-three (23,163) were

assaulted[2] during traffic stops.  While this was not specifically a traffic stop, since

McDaniel was already stopped, it was akin to a traffic stop in that it was an encounter

with a suspect in a vehicle.

2.  Second, officers are trained that traffic stops are "fraught with danger" for police

officers.  Traffic stops are contacts where officers often have limited information about

the vehicle's occupants, limited visibility of the driver and occupants, and the driver

has numerous places in the vehicle in which they could hide a weapon.

3.  Third, McDaniel had hours earlier, crashed into a motorcycle and then fled at a high

rate of speed, while driving recklessly. (Blacksburg at 198).

---

[1] https://ucr.fbi.gov/leoka/2019/topic-pages/tables/table-23.xls

[2] https://ucr.fbi.gov/leoka/2019/topic-pages/tables/table-83.xls; https://ucr.fbi.gov/leoka/2018/tables/table-83.xls;
https://ucr.fbi.gov/leoka/2017/tables/table-83.xls; https://ucr.fbi.gov/leoka/2016/tables/table-73.xls;
https://ucr.fbi.gov/leoka/2015/tables/table_73_leos_asltd_circum_at_scene_of_incident_by_population_group_and_percent_cleared_2015.xls

4. Fourth, at the time of Constable Janesky's and Officer Campbell's encounter with McDaniel, he was inside a vehicle, with the doors locked and with the keys and ability to drive away, resuming his previous, dangerous flight.

5. Fifth, Andy McDaniel, officers were told by deputies, was known to fight with law enforcement.

6. Sixth, it was dark during the encounter, with no lighting other than the officer's flashlights.

7. Seventh, McDaniel was originally slumped over on the driver's side of the truck when officers approached, but when he woke up, he began yelling in panicked tone of voice, and he was moving around in the vehicle, according to officers. It is noted that, at 00:08 on Constable Janesky's body camera, both of McDaniel's hands are up and visible. However, from 00:08 – 00:15, neither of McDaniel's hands are visible. From 00:16 – 00:18, only McDaniel's left hand is visible on body camera. From 00:19-00:42, no hands are visible on Janesky's body camera. Both Janesky and Campbell reported that McDaniel was reaching around in his truck and a reasonable and well-trained officer could believe he possibly may be looking for a weapon or his keys to resume his dangerous driving.

8. Therefore, it is my opinion that a reasonable and well-trained officer would be consistent with generally accepted police practice and training in believing that, under the totality of the circumstances, McDaniel's presence in the truck, and his ability to drive away, under the totality of the circumstances, significantly enhanced the danger or threat to the safety of the officers.

g. Graham Analysis – Third Factor.

1. Considering whether McDaniel was actively resisting or attempting to evade arrest by flight, initially McDaniel refused to open his door.

2. Due to the threat posed by leaving McDaniel in the truck, Constable Janesky broke the window and opened the door. McDaniel reportedly held onto the steering wheel to resist being pulled from the truck. McDaniel's right arm can be seen on Officer Campbell's body camera, at 00:08, reaching back into the vehicle, as Constable Janesky is seen struggling to pull McDaniel out. This is considered active resistance because McDaniel was taking affirmative action or physical measures to defeat an attempt to arrest him.

3. Further, Officer Campbell and Constable Janesky reported that once McDaniel was on the ground, he was using his arms and legs, rolling around, and tensing his arms to resist the officers attempts to handcuff him. The officers' body camera video is difficult to fully interpret because of movement on the part of Janesky, Campbell and McDaniel, but it does show McDaniel in a prone position at 00:58 on Janesky's body camera. Then, at approximately 1:08 on Janesky's body camera, McDaniel appears to be on his side. At 00:27-28 on Officer Campbell's body camera, McDaniel can be seen on his side as officers order him to "stop resisting." (Campbell BWC at 00:27-28).

4. The International Association of Chiefs of Police (IACP), in the Model Conducted Energy Weapon Policy, defines active resistance as "*the use of non-assaultive physical measures by an unarmed person, including flight, to resist and or prevent an officer from gaining control.*" (IACP, Model CEW Policy (2019)). In McDaniel's case, his conduct could cause a reasonable and well-trained officer in Constable Janesky's and

Officer Campbell's position to believe that McDaniel was actively resisting their attempts to handcuff and arrest him.

h.     Police officers are trained regarding various force options that are generally available. These options are sometimes referred to as a "use of force continuum," as the options are listed in the order of intrusiveness. Typical use of force options would be as follows: (1) Officer Presence; (2) Verbal Direction; (3) Soft Empty Hand Control, such as grabs, holds, and joint locks; (4) Hard Empty Hand Control, such as closed fist strikes, knee strikes, and kicks; (5) Less-Lethal Weapons (Taser, baton, canine), and (6) Deadly Force. (https://nij.ojp.gov/topics/articles/use-force-continuum). When we examine the encounter with McDaniel, in totality, we see that the use of force options were applied in accordance with generally accepted police practice and training.

1. The first option is "Officer Presence." Officer McDaniel and Constable Janesky were on the scene wearing uniforms that identified them as law enforcement. They also verbally identified themselves as "police."

2. The second force option is "Verbal Direction." Campbell and Janesky told McDaniel at least nine times to open the truck door. The verbal commands did not gain McDaniel's compliance, as he continued to fail to comply, yelled frantically, and moved around in the vehicle as if looking for something. After repeated non-compliance, the officers were left with two options. The first was to "wait and see" if McDaniel would eventually comply and open the door; this carried the risk that McDaniel may start the truck and resume his dangerous driving and flight, may use his vehicle as a weapon or may retrieve a weapon. The second option was to break the window of the truck and open the door. This involved no physical force on the person of McDaniel; in fact, McDaniel was warned to beware of the breaking glass. This

option also quickly assists the officers in separating McDaniel from the vehicle, the tool with which he could most likely endanger the officers and the public.

3. The third force option is "Soft, Empty-Hand Control," such as grabs, holds, and joint locks. Grabbing McDaniel's arm to pull him from the vehicle, as Constable Janesky is seen doing on Campbell's body camera, would be considered "soft, empty-hand control." Additionally, struggling, grappling or wrestling with McDaniel to gain control of his arms would also be considered "soft, empty-hand control." From time stamps on Janesky nd Campbell's body camera video, it took approximately forty seconds from the time McDaniel was placed on the ground to the time he was secured in handcuffs. Both Janesky and Campbell both stated in the SLED investigation and in deposition that that did not strike McDaniel in any manner. Thus, according to officer's, they did not advance to "hard empty hand control" tactics, the fourth option in the use of force. This is also considered "soft empty hand control."

i.  Officers are trained that the use of force option(s) they choose must be reasonable. The are also trained that

> *The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation.* (Graham v. Connor, 489 U.S. 386, 396-397 (1989)).

In the incident with McDaniel, Constable Janesky and Officer Campbell had to make a "split-second" decision regarding separating McDaniel from his vehicle and handcuffing McDaniel. Officers are trained that it is proper to separate a dangerous driver from their vehicle during the

officer/citizen encounter if there is a possibility that the driver may be able to resume dangerous driving, thereby endangering the officers and the public, or by accessing a weapon. Additionally, the methods or manner in which Constable Janesky and Officer Campbell wrestled with McDaniel to handcuff him are also split-second decisions.

j. Officers are trained in handcuffing techniques. One such technique, for when a suspect is prone, is for the officer to place his knee across the shoulder blade or scapular area of the suspect in order to control the suspect's movement and obtain an advantageous position to secure the handcuffs.

k. Officers are also trained that, when a reasonable use of force option or technique is utilized, but the suspect nonetheless experiences an injury, the officer has not violated generally accepted police practice. Specifically, officers are trained that

> *Any takedown can go awry—some suspects fall clumsily, while others have fragile bones— but, if the officers use steps reasonably likely to effect a clean takedown, an injury does not lead to liability. Assessment under Graham is objective; a court asks whether the force used was reasonable, not whether things turned out badly. See, e.g., Kelsay, 933 F.3d 975 (suspect suffered a broken collarbone); Hogan v. Cunningham, 722 F.3d 725 (5th Cir. 2013) (qualified immunity for a tackle takedown in which officer landed awkwardly on suspect, causing two broken ribs); Becker v. Bateman, 709 F.3d 1019 (10th Cir. 2013) (qualified immunity for a clean throw-down takedown in which the suspect suffered a brain injury). See also Dockery v. Blackburn, 911 F.3d 458, 468-69 (7th Cir. 2018), which discusses the need for a margin of error in arrest procedures. (Johnson v. Rogers, 944 F.3d 966, 969 (7th Cir. 2019)).*

The SLED investigation noted that body camera video appeared to show Officer Campbell's knee on McDaniel's shoulder and Constable Janesky's knee on McDaniels back. As stated above,

officers are trained that when handcuffing a suspect in a prone position, a knee may be placed on a suspect's scapula or shoulder blade to facilitate control of the suspect and provide a position of advantage when handcuffing. The SLED investigation also noted that the video did not contradict Constable Janesky and Officer Campbell's statements. Additionally, in a review of the body camera videos of Janesky and Campbell, I did not see or hear any strikes with hands, knees or feet.

l.  Therefore, for the reasons stated in Subparagraphs (a) – (k) above, it is my opinion that the force used by Constable Janesky (breaking the window, pulling McDaniel from the truck to the ground, and struggling with him to put handcuff's on and the force used by Officer Campbell (struggling with McDaniel to secure handcuffs) were in accordance with generally accepted police practice.

> **Opinion: The Town of Blacksburg Police Department's Motor Vehicle Stops/Searches, Stop Arrest and Search of Persons, Response to Resistance, Body Worn Camera, Internal Affairs/Citizen Complaints and Training Directive Policies are in accordance with generally accepted policy practice.**

21.     It is my opinion, based on my background, training, experience as a police officer, experience as a detective, experience as a police supervisor, experience as a police commander, instructor, education, and continued research, writing, and training, that the Town of Blacksburg Police Department's Motor Vehicle Stops/Searches, Stop Arrest and Search of Persons, Response to Resistance, Body Worn Camera, In Car Video, Internal Affairs/Citizen Complaints and Training Directive Policies are in accordance with generally accepted policy practice.. This is based on the following:

a.      The Motor Vehicle Stops/Search policy in is accordance with generally accepted police practice in that it follows legal mandates regarding such stops and searches.

b.      The Stop, Arrest and Search of Person's policy is in accordance with generally accepted police practice in that it follows legal mandates related to such actions.

c.      The Response to Resistance policy is in accordance with generally accepted police practice in that (1) the definitions are generally accepted and in accordance with legal mandates, (2) the use of force considerations are consistent with legal mandates, (3) the force options are commonly accepted in law enforcement, as are the (4) procedures, (5) medical aid requirement, and (6) reporting requirements.

d.      The Body Worn Camera policy is in accordance with generally accepted police practice in that it provides commonly accepted reasons for use of such camera and accepted incidents and procedures for such use.

e.      The Internal Affairs Policy is in accordance with generally accepted police practice in that it (1) requires the investigation of complaints and serious allegations of misconduct; (2) provides procedures and requirements for handling complaints; (3) provides for complaint processing; (4) follows state regulations; and (5) provides for disciplinary action.

f.      The Training Directive policy is within generally accepted police practice in that it (1) mandates training on high-risk activities, (2) it follows state legal mandates, and (3) it requires that training be documented.

> **Opinion: The Town of Blacksburg Police Department and the Town of Blacksburg did not act contrary to generally accepted police practices in the areas of policy, custom, practice, training, and supervision regarding the use of force.**

22.     It is my opinion, based on my background, training, experience as a police officer, experience as a detective, experience as a police supervisor, experience as a police commander, instructor, education, and continued research, writing, and training, that the Town of Blacksburg Police Department and the Town of Blacksburg did not act contrary to generally accepted police practices in the areas of policy, custom, practice, training, and supervision regarding the use of force. This is based on the following:

a.     In the materials reviewed, I saw no evidence of a policy, custom, or practice that is contrary to generally accepted police practice regarding the use of force.

b.     In the materials reviewed, I saw no evidence of a failure to train or supervise such that the police department or the city acted contrary to generally accepted police practice.

c.     A review of Constable Janesky's training record appears to be in accordance with generally accepted police practice in that he received update training and is a sworn constable in the State of South Carolina.

23.     At this stage of my review, I do not know if I may be asked to review additional documents. Should I be asked to review any additional documents, I will be prepared to render additional opinions or supplement the opinions stated within this report.

24.    At this point in the development of this case I do not know whether I will be using any demonstrative aids during my testimony. Should I decide to use any such tool; I will assure that they are made available for review, if requested, prior to their use.

25.    My fees for this professional service are an initial retainer fee of $5,000 paid to LLRMI, and any work over 20 hours will be billed at $250/hour. Additionally, there is a fee of $2500 for a deposition in Marietta, Georgia or $2500 per day plus expenses for services away from Marietta, Georgia including depositions and trial appearances.


This report is signed on this 21st day of March , 2024 in Marietta, Georgia.

Brian S. Batterton

27