Brian Batterton

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

- - -

ANDY LAWSON McDANIEL,

    Plaintiff,

vs.

    Case No.
    7:23-CV-01527-TMC-JDA

R. TODD CAMPBELL; DARREN M.
JANESKY; TOWN OF BLACKSBURG,
a/k/a BLACKSBURG POLICE
DEPARTMENT; MAYOR MIKE
PATTERSON; POLICE CHIEF
JAMIE P. HAM; CHEROKEE
COUNTY SHERIFF'S DEPUTY MARK
HUTCHENS; and CHEROKEE
COUNTY SHERIFF'S OFFICE,

    Defendants.

---

VIDEO CONFERENCE DEPOSITION OF BRIAN BATTERTON

---

DATE TAKEN:     Thursday, June 27, 2024

TIME BEGAN:     10:03 a.m.

TIME ENDED:     2:52 p.m.

LOCATION:       (All parties appearing remotely.)

REPORTED BY:    Lisa Garson, Court Reporter
                EVERYWORD, INC.
                P.O. Box 1459
                Columbia, South Carolina 29202
                803-212-0012

EXHIBIT 25

Page 68
1  drive.
2  Q   A dangerous driver according to all those
3  third-party witnesses not identified in the
4  investigative report?
5  A   And according to the poor guy that got
6  run into on his motorcycle, and the physical
7  evidence of his motorcycle being crunched.
8  Q   So you rely, as a part of all your
9  opinions, that Andy McDaniel was a dangerous
10 driver?
11 A   Yes.
12 Q   And other than the fact that he bumped
13 into the motorcycle, what facts are in support of
14 that conclusion?
15      MS. COFFEE:  Object to the form.
16      THE WITNESS:  Well, he crashed in the
17   back of a motorcycle.
18 BY MR. FEW:
19 Q   That's what I said.  I said other than
20 that.
21 A   Well, that's significant.
22 Q   You're answering my question with my
23 question.
24      Other than the fact that he had the bump
25 and run with the motorcycle, what facts do you rely

Page 69
1  on to reach a conclusion that he's a dangerous
2  driver?
3       MS. COFFEE:  Object to the form.
4       THE WITNESS:  Well, number one, he was no
5    longer on the scene.  A person that commits a
6    hit and run is typically considered more of a
7    dangerous driver than a person who has a crash
8    and remains on the scene voluntarily.
9       Number two, witnesses -- although we
10   don't know their names -- said that he drove
11   off at a high rate of speed.  I believe I read
12   that one of such witnesses actually attempted
13   to follow him, but the guy was going so fast
14   he outran him -- the guy being McDaniel.  That
15   is number two or three.
16      Additionally, after the fact, they
17   learned that McDaniel had had a previous wreck
18   that same day; so I base my opinion on
19   everything that I read, which would include
20   the fact that he had said that he had a second
21   wreck earlier in the day -- the motorcycle
22   wreck was actually the second wreck.
23      But those things, in conjunction with
24   crashing into the back of a motorcycle, in my
25   opinion, make him a dangerous driver.

Page 70
1  BY MR. FEW:
2  Q   Okay.  You stated that on paragraph six
3  of page 15, which is a subparagraph of C, which is
4  a subparagraph paragraph 19 that begins on page 13,
5  you state, "When Officer Campbell and Constable
6  Janesky arrived to check the truck, they observed a
7  red truck."
8  A   Yes.
9  Q   Okay.  So did they turn their body
10 cameras on when they arrived at the scene?
11 A   They turned their body camera on when
12 they -- no, they did not.  They turned it on when
13 they were making contact with McDaniel.
14 Q   And that is violation of the Body Worn
15 Camera Policy?
16 A   Is that a question or a statement?
17 Q   Yes, it is.
18 A   I don't believe it is.  Now, I know what
19 Mullinax testified to -- Chief Mullinax in his
20 30(b)(6) deposition -- so I don't dispute that;
21 that, in his opinion as the chief, it now is a
22 violation of the Body Worn Camera Policy; but as
23 that policy is written -- and if you have it handy
24 and can pull it up, if not I can pull it up and
25 read it to you.

Page 71
1       It says that you turn it on at arrival at
2  the scene, and then it says 'or' when contacting a
3  citizen or contacting a person, something along
4  those lines.
5       So there is an 'or' there, and it's my
6  opinion that that creates enough ambiguity that a
7  reasonable officer interpreting that policy could
8  view that as they can turn it on when they arrive
9  at the scene, or they can turn it on when they're
10 contacting another person, and they apparently
11 turned it on when they contacted another person.
12      And additionally, I know that Mullinax
13 said in his 30(b)(6) something to the effect of,
14 you turn it on when you're getting out of your car,
15 or something like that, and as a matter of
16 practice, I agree that's how I want my folks
17 to do it, too.
18      However, when we're looking at their
19 policy, their policy doesn't say you turn it on as
20 you're exiting your car, unambiguously.
21      It gives two potential times when you can
22 turn it on because there's an 'or' in there; so
23 that's why I answered you that I don't believe that
24 they did violate that policy.
25 Q   And you didn't conduct any analysis in

Page 80

1  clear that 550 and 549 refer to the videos.
2  These are screen shots, right?
3      MR. FEW: Screen shots from those videos.
4      MS. COFFEE: Okay. I just wanted to make
5  sure that's clear.
6  BY MR. FEW:
7    Q   Yeah. And over here on the right-bottom
8  corner it says 230810; do you see that?
9    A   I do.
10   Q   And that would indicate that this body
11 camera footage, which is at the 2-second mark,
12 started sometime around 11:08 and 8-seconds or
13 9-seconds. Do you agree with that?
14   A   I agree that, on that camera that's what
15 the time would show; but I don't believe that
16 that's an accurate time.
17   Q   And why do you believe that's not an
18 accurate time?
19   A   If you look at the SLED report -- it's
20 Bates 257 -- that would be the page number to go
21 to.
22       In the last paragraph -- do you want to
23 get to it, or do you want me to just continue?
24   Q   No. I want you to just tell me the basis
25 of your opinion that this is not an accurate time

Page 81

1  stamp.
2    A   The last paragraph of that page, towards
3  the bottom of the paragraph, it says, agent's note,
4  based on BWC, body-worn footage, from Constable
5  Janesky, and the radio traffic, there was a delay
6  of approximately 1-minute and 9-seconds from the
7  time officers were on scene to any body worn camera
8  activation, if the time stamps on the body worn
9  camera footage were correct.
10       So the time on the CAD report, which
11 would be radio traffic, they typed this in --
12 presumably it's the correct times, but it's not
13 always the correct times because it's operated by a
14 person who can make an error -- he says they're out
15 with a red pickup at 23:02:26, so 11:02:26; he says
16 that he's combative at 23:03:48, so the body
17 cameras are activated, I believe, by then, so by
18 the time he's combative; that would indicate to me
19 that the on-scene time of 23:02, and the combative,
20 is a minute-and-a-half-ish later; and the body worn
21 camera -- Janesky was activated in between those
22 times.
23       And that's also documented in the SLED
24 report -- you know, based on what I just read you
25 from the SLED report.

Page 82

1    Q   Okay. So you understand that Janesky's
2  body cameras are provided in a series of 30-minute
3  segments, right?
4    A   I understand that I got a lot of videos
5  from him. I didn't know that's why.
6    Q   Okay. And you believe that the CAD
7  report should be consistent about when they called
8  out for EMS, right?
9    A   I mean, I would expect it to be, as long
10 as it was entered at the time that they called.
11   Q   Now, the opinion that you just described
12 about the accuracy of the time stamp on Janesky's
13 body worn camera, which was his personal body worn
14 camera, right?
15   A   Correct.
16   Q   And that's a violation of the policy,
17 right?
18   A   I don't think it's a violation of the
19 policy. He wasn't issued a body worn camera and so
20 he provided his own in the interest of being up to
21 standard.
22       I mean, as you pointed out, even state
23 law requires use of body cameras; so consequently,
24 I don't think that it violates the policy because
25 the policy says that all of their officers will

Page 83

1  not -- will have department-issued body cameras and
2  are not allowed to use their own; but he's a
3  constable, he's not an officer who is provided one;
4  so it would seem to me that if the city is
5  providing one with a body camera, you should not
6  use your own, and that's for their officers.
7    Q   So page two of seven of the Body Worn
8  Camera Policy, which is on the screen right now at
9  paragraph D, states, "Officers of this department
10 are prohibited from using privately owned body worn
11 cameras."
12       Your testimony is that that's not
13 violated by Janesky using his own private body
14 camera?
15   A   That's correct. Because he's not an
16 officer in the department, he's a constable; and
17 he's working with, or for, the department, and they
18 didn't provide him one but he's supposed to --
19 they're supposed to have them, even according to
20 state law.
21   Q   Yes, they are.
22       Where's the language that you referred to
23 that gives the officers discretion as to when
24 they're gonna turn their body camera on?
25   A   All right. Okay. Can you scroll to the

Page 84

1 top, please, and then -- okay. Now start scrolling
2 down for me, that way I won't miss it.
3      Next page. Okay. Hold on one sec.
4 Okay. Right here, G-A. "Activating the
5 video/audio recording as soon as the officer makes
6 citizen contact or the law enforcement event
7 begins."
8      And then the next one, B. "Activating
9 video/audio when officer arrives at a street
10 encounter or citizen contact initiated by another
11 officer."
12   Q   Okay. So you read that as giving
13 discretion to the officers about --
14   A   Keep scrolling. There may be one more.
15   Q   Well, I mean, is this what you were
16 relying on or not?
17   A   Well, I'm saying that's part of it but
18 there may be one more, if you would like to keep
19 scrolling; or I'll take a moment and I'll go find
20 it, just in case.
21      I want to be thorough. You wanted me to
22 be complete.
23   Q   Yes, I do.
24   A   Could you go up for one second. There
25 was something I might have missed here.

Page 85

1   Q   Well, let me ask you one more question.
2 On J, it says, "An officer who does not activate a
3 body worn camera in response to a call for
4 assistance shall document in the incident report,
5 or otherwise note in the case file or record the
6 reason for not activating the camera."
7      That wasn't done here, was it?
8   A   No. But just based on my experience in
9 police work, I don't believe that's what it means.
10      I believe that that means when an officer
11 has zero body worn camera footage of an incident,
12 they have to say why, such as, my battery was dead,
13 or the camera didn't work, et cetera.
14      That is a fairly common, sort of,
15 statement, and in law enforcement circles it's
16 interpreted to mean when you got no footage.
17      But if you go up to -- just like an
18 inch -- it might also be something.
19      All right. I guess that's it.
20   Q   So G-A is what you were referring to
21 before?
22   A   I believe so. I just thought that I had
23 seen it worded slightly different. I thought it
24 said, on scene or when he makes citizen contact,
25 but I could just be imagining that.

Page 86

1      But the intent -- or the 'or' is still
2 there, and it says or makes citizen contact.
3   Q   But what it says is, it says, "Activating
4 the video/audio recording as soon as the officer
5 makes citizen contact or the law enforcement event
6 begins."
7      So citizen contact is the first incident
8 reason to turn it on, or the law enforcement event
9 begins; but your interpretation is that that's
10 intended to give the officer discretion as to when
11 to turn it on based on when he or she makes citizen
12 contact, right?
13   A   Well, my interpretation is that it could
14 create some ambiguity there; and I didn't see any
15 kind of write-up on the counseling part of the
16 then-chief, because Chief Mullinax wasn't the chief
17 then; so that may be indicative that it wasn't
18 believed to have been a violation of the policy.
19      That would be for someone else to be
20 asked, at that point, but I gave you my opinion,
21 and my opinion is that that creates some ambiguity.
22   Q   Well, I did ask someone else that
23 question, and that was in the 30(b)(6) of Brian
24 Mullinax, on page 76, at line 24.
25      I said, "So that the answer that we have

Page 87

1 here today is that there are no records related to
2 enforcement of the body worn camera policy?"
3      Answer: "Not that I'm aware of."
4      Do you recall reading that?
5   A   I do.
6   Q   So in response to the 30(b)(6) question,
7 Blacksburg has not one single document to show that
8 they've ever conducted any review as to compliance
9 or noncompliance with the body worn camera.
10   A   Well, I also didn't see anything in the
11 materials that indicated there were -- there was a
12 pattern of events of not properly activating video
13 cameras, and it not being documented or corrected.
14 So the flip side of that is, it could be that they
15 don't have a problem with it.
16   Q   Well, Mr. Batterton, if they have no
17 records, then how would anybody know?
18   A   Well, you wouldn't have a record if
19 everybody complied with policy. There wouldn't be
20 a record of there being a problem.
21   Q   Similarly, he was asked on page 78, "Are
22 you aware of anybody that's ever been written up
23 for proper application or improper application, or
24 in any way are there any records to document that
25 this policy has been enforced?"

Page 88

1  This was in response to the request for
2 resistance.
3    A    Was that a question?
4    Q    Yeah.
5    A    What was the question?
6         MS. COFFEE:  Object to the form.
7 BY MR. FEW:
8    Q    His response was, "I'm not aware of any
9 write-ups."
10        So Blacksburg has not one single piece of
11 paper to show that they've enforced their body worn
12 camera, and not one single piece of paper to show
13 that they've enforced their Response to Resistance
14 Policy; isn't that true?
15   A    It is not.  I saw a Use of Force
16 Reporting Form included in the materials, which is
17 essentially a review of a use of force, so that
18 shows that they're examining use of force incidents
19 and how they relate to policy.
20        And I also note that Chief Mullinax has
21 only been employed by them for a relatively short
22 period of time.  I believe at the time of this
23 incident, which was what, approximately
24 two-and-a-half, three-years ago, he was still
25 employed by the sheriff's department; so his answer

Page 89

1 was, not to my knowledge, and his knowledge is not
2 long term on that.
3    Q    You're not giving an expert opinion on
4 what a 30(b)(6) deposition is intended to address,
5 are you?
6    A    I'm answering your question.
7    Q    Okay.  So you referred to the Response to
8 Resistance Form related to the Andy McDaniel
9 incident.  Any other document that you are aware of
10 that shows any review of the Use of Force Policy?
11   A    There was no other document provided to
12 me other than a SLED investigation, which I don't
13 think is what you're asking about.
14   Q    And do you recall when that Response to
15 Resistance Form was reviewed, or signed off on by
16 any supervising officers at Blacksburg?
17   A    I don't.
18   Q    What if I were to tell you that it was
19 not until January 27, 2022, over three-months after
20 the incident in question?
21   A    That's not a -- I mean, it would be nice
22 if it was a little quicker but there was also a
23 SLED investigation going on; so I don't know, off
24 the top of my head, when the SLED investigation was
25 completed and when the solicitor reviewed it and

Page 90

1 delivered his decision not to prosecute; so based
2 on that, that potentially could explain a delay,
3 but I don't know.  You'd have to ask the person
4 that did it.
5    Q    Well, let's be clear on a few things that
6 we can agree on.  Where are the documents that show
7 that there has been any review for compliance or
8 noncompliance of the Body Worn Camera Policy?
9         MS. COFFEE:  Object to the form.
10        THE WITNESS:  I apologize, but the first
11   part of your question cut out.
12 BY MR. FEW:
13   Q    Where are the documents that show that
14 there has been any review for noncompliance or
15 compliance of the Body Worn Camera Policy?
16        MS. COFFEE:  Object to the form.
17        THE WITNESS:  I have not seen any
18   documents either way on that.
19 BY MR. FEW:
20   Q    Okay.  And with the same question about
21 compliance or noncompliance with the Use of Force
22 Policy, the only one that you're aware of is this
23 Response to Resistance Form that was signed off on
24 by Sergeant Holland on January 27, 2022; is that
25 right?

Page 91

1         MS. COFFEE:  Object to the form.
2         THE WITNESS:  That's the only one that
3    was provided to me.
4 BY MR. FEW:
5    Q    And that's the one that said that the
6 most use of force that was applied was soft empty
7 hand control, right?
8    A    Correct.
9    Q    So in your report, you didn't endeavor to
10 opine as to whether or not there was compliance
11 with the Body Worn Camera Policy.  You've just
12 answered my questions here today, and your opinion
13 is that it was complied with because of the
14 ambiguity that is set forth in G-A, on page three
15 of the Body Worn Camera Policy which is on the
16 screen right now; is that right?
17   A    Well, I didn't provide in my report an
18 opinion on compliance to the Body Worn Camera
19 Policy because the crux of this incident is the
20 actual use of force event; and both body worn
21 cameras were turned on at the use of force event,
22 so I wasn't even considering the Body Worn Camera
23 Policy as a subject of my opinion.
24        I'm providing an opinion to you today
25 because I'm required to answer your questions and

Brian Batterton

Page 92
1  you're asking me about it; so I am using what I
2  remember from reviewing the case, and I am using
3  the policy, and I am providing you an opinion in
4  your answer.
5       MR. FEW:  Let's take a look at the CAD
6    report for the suspicious vehicle, and we'll
7    mark this as Exhibit 9 -- well, hold on.
8       The Body Worn Camera Policy, I didn't put
9    that in yet.  Let's let that be 9, and this
10   will be 10.
11      (Batterton Exhibit 9, Blacksburg Police
12   Department, Blacksburg SC, Body Worn Camera
13   Policy, Bates Blacksburg 000570 -576, marked
14   for identification.)
15      (Batterton Exhibit 10, Cherokee County
16   CFS - Command Log, Bates Blacksburg 000691 -
17   698, marked for identification.)
18 BY MR. FEW:
19   Q   Okay.  Looking at page two of Exhibit 10,
20 which should be a compilation of all of the CAD
21 related documents that were produced related to the
22 suspicious vehicle, which is the CAD CFS log that
23 ends in 539, this shows that B26 is on scene at
24 22:59:15.  Do you see that?
25   A   I'm looking.  I do see that.

Page 93
1   Q   And that would be Janesky, right?
2   A   Correct.
3   Q   And then B5 says he's on scene at
4 23:00:27, right?
5   A   Yes.
6   Q   So both of them are basically there at 11
7 o'clock?
8   A   The CAD report that I was looking at has
9 different numbers, which could explain what I was
10 talking about before of these earlier times are
11 when they met with the complainant upon their
12 initial arrival, and the second on-scene times
13 could be when they actually got to the truck.
14      That's speculation, but there's clearly a
15 difference.
16   Q   All right.  Well, let's just do this.
17 This is what we went over earlier.  At 23:02:26,
18 Campbell reports that he is out with the red truck,
19 damaged, the male is passed out, and TPD715 is the
20 license plate number, isn't it?
21   A   Yes, sir.
22   Q   So unless he's clairvoyant, at 23:02:26,
23 he is on the scene, correct?
24   A   Yes.
25   Q   So has the law enforcement event begun?

Page 94
1   A   Yes.
2   Q   Okay.  So his body camera should be
3 turned on?
4   A   Well, you've got a screen shot of it
5 there.
6   Q   But you're disputing -- you're arguing
7 about the time that it all starts.
8       MS. COFFEE:  Object to the form of the
9    question.
10      THE WITNESS:  You told me to look at the
11   time that it all starts, and you gave me a
12   ten-minute break to do it; and I contacted you
13   and told you that the -- even the SLED report
14   says he was on scene for about 1-minute and
15   9-seconds before he turned it on -- Janesky.
16      And with that in mind, we've already
17   said -- I mean, before you told me that the
18   SLED report speaks for itself, so I still
19   don't know why we're going on with an 8-minute
20   delay; but at any rate, I'll give you that it
21   appears that Campbell is about 40-seconds
22   later than Janesky on turning his camera -- or
23   on his camera being activated; so to the
24   extent that that's a 40-second-too-late
25   violation of policy, maybe so but --

Page 95
1 BY MR. FEW:
2   Q   Okay.  Where's the --
3       MS. COFFEE:  Let him finish, Wes, please.
4       THE WITNESS:  To finish.  To that extent,
5    they still hadn't physically made contact with
6    the guy.  They couldn't reach him because he
7    was locked in a truck.
8       So when the use of force event started,
9    he had -- his camera was running when the use
10   of force event started.  And from almost
11   30-years in law enforcement, assuming that
12   this is a violation of policy, the correct
13   remedy for this, from someone with extensive
14   experience in law enforcement supervision is,
15   you would verbally counsel that guy and say
16   you're supposed to turn your camera on sooner
17   than that; and you're not gonna split hairs in
18   the middle of an incident like that.
19      Additionally, that 40-seconds has nothing
20   to do with the use of force event, and that
21   from my experience in law enforcement
22   supervision, the correct remedy for being
23   40-seconds late turning on your body camera,
24   when the actual use of force had not yet
25   begun, would be verbally telling him,

Page 96

1  counseling him to not do that anymore, to turn
2  his camera on sooner.
3      Additionally, I don't know what kind
4  camera he had. I don't know how it operates.
5  Some cameras, when you hit the button to turn
6  them on can be set to -- because they record
7  in a loop, they can be set so that you have
8  30-seconds of video prior to the camera on
9  button, the record button being pushed, but
10 some cameras cannot.
11     The older cameras were not that
12 technological, and they come on when you push
13 the button; and your computer or your
14 television, when you push the button to turn
15 them on, they don't always instantly come on
16 and again, do what you want them to do. They
17 take a second or two or five.
18     So I don't know what kind camera he had,
19 when he pushed the button to activate it, et
20 cetera, but this is not the policy violation
21 that impacts the use of force event.
22 BY MR. FEW:
23  Q  Okay. Where on this report that we're
24 looking at do we see the first reference to a call
25 to EMS?

Page 97

1  A  I'm looking.
2  Q  I'll help you out. It's at, 23:12:19.
3  Do you see that?
4  A  I do.
5  Q  Okay. So if we were to look at Janesky's
6  body camera, or Campbell's, and see when the EMS
7  call was made on those body cameras, that should
8  sync up with this entry of 23:12:19, right?
9  A  Possibly.
10 Q  I mean, they're not gonna wait 5-minutes
11 to call an ambulance if someone says call an
12 ambulance, are they?
13 A  I don't understand that question.
14 Q  Well, let me give it to you even better.
15    As of 23:12:30, M3 has been dispatched,
16 and that's the EMS response.
17 A  Okay.
18 Q  Do you agree with that?
19 A  I see that. Yes, I agree.
20 Q  M3 Primary is Medic 3 EMS. Do you see
21 that?
22 A  I do.
23 Q  And they would have their own records
24 about when they received the call to go out, right?
25 A  Correct.

Page 98

1  Q  Okay. So do you recall, on Janesky's
2  body camera, how far into his body camera was EMS
3  called?
4  A  I don't recall because I wasn't really
5  listening for that.
6  Q  Well, let's just take the time and look
7  at it and see if we can figure that out.
8  A  Okay. Am I doing that independently, or
9  are you about to pull it up?
10 Q  I'm gonna pull it up if I'm able to. All
11 right. This should be 550. I'm gonna pull it up,
12 but I'll have to change my share screen. Hang on.
13    Can y'all see that, or do I need to
14 switch it?
15 A  I don't see it, sir.
16    MR. HARTER: I cannot see it.
17    MS. COFFEE: Me either.
18    MR. FEW: How about now?
19    MS. COFFEE: I see the screen shot.
20    MR. FEW: No. It should be playing.
21    THE WITNESS: I don't hear anything. Do
22 you hear audio?
23    MS. COFFEE: No.
24 BY MR. FEW:
25 Q  All right. Sorry. You couldn't hear

Page 99

1  that, but Janesky says, We have an ambulance
2  coming.
3     Can you hear me?
4  A  I can.
5  Q  Okay. So shortly before the 23:11:26
6  mark on this body camera, which has been playing
7  for 3-minutes and 17-seconds, that's the first
8  indication that there's an ambulance call; but your
9  testimony is that, based on the SLED report that
10 the body cameras were turned on sometime around
11 23:02:26.
12    MS. COFFEE: Object to the form of the
13 question.
14    THE WITNESS: I don't know. I didn't do
15 a mental calculation of what time it would
16 have been turned on. I just looked at it as
17 what the SLED report said, and the amount of
18 time you can see elapsed between them saying
19 they're on scene and the body worn camera
20 actually picking up.
21    However, I will say this. Just because
22 Janesky says -- let me ask you this: Do you
23 hear Janesky calling the ambulance, or do you
24 hear on his body camera another person
25 communicating with dispatch, calling the

Page 108

1  Q   Okay. Are you aware that he got a phone
2  call that evening from Cody Painter, with the
3  Cherokee County Sheriff's Office, at 9:97 p.m.?
4       MR. HARTER:  Object to the form.
5       Go ahead.
6       THE WITNESS:  I was aware of it.
7       I was aware of it when I received 30(b)6
8       material and reviewed it.
9  BY MR. FEW:
10 Q   Clearly, Campbell is referring to
11 something other than the dispatch notice.
12      MS. COFFEE:  Object to the form.
13      THE WITNESS:  When Ms. Coffee objected,
14      your question cut out.
15 BY MR. FEW:
16 Q   When Campbell says, We got a call a
17 half-hour ago, an hour ago, and somebody said, Are
18 you looking for Andy McDaniel, do you think he was
19 referring to the call that came over the dispatch
20 based on the Suspicious Vehicle Report from
21 Mr. Martin that came in at 10:47 p.m. that night?
22 A   I don't think so because he said about
23 30-minutes or an hour ago.
24 Q   He was referring to somebody calling him
25 and telling him where Andy McDaniel is, wasn't he?

Page 109

1       MS. COFFEE:  Object to the form.
2       MR. HARTER:  Object to form.
3       THE WITNESS:  He said on that video that
4       someone told him where Andy McDaniel was. I
5       think he said words to the effect of, someone
6       said, Check out Andy McDaniel or look for Andy
7       McDaniel, not Andy is sitting at this specific
8       location.
9       Because if so, I don't know why they
10      wouldn't have gone there then. Also, that
11      would be illogical.
12 BY MR. FEW:
13 Q   Maybe because it was out of their
14 jurisdiction. Maybe that was the reason.
15      Do you think that might have been a
16 reason?
17 A   I don't. Because if that was the reason,
18 then why would they have done the enforcement
19 action that they took when they responded to the
20 actual dispatch? So it's not logical.
21      Ultimately, I would imagine that those
22 people would have to be asked their subjective
23 motives.
24 Q   Well, would it be difficult for anybody
25 to just ask Todd Campbell who he got the call from?

Page 110

1  A   I don't know if they still have contact
2  with him, so I don't know if it would be difficult.
3  Q   Well, Ms. Coffee represents him, and he
4  did not invoke his Fifth Amendment privilege in his
5  deposition at any point in time, did he?
6  A   Not that I recall.
7       MS. COFFEE:  Object to the form.
8       I'm pretty sure he did.
9  BY MR. FEW:
10 Q   On your fourth opinion about the use of
11 force being consistent with generally accepted
12 police practice and training, you based that under
13 your assumption that nothing beyond soft empty hand
14 control was used; isn't that right?
15      MS. COFFEE:  Object to the form.
16      THE WITNESS:  No. I believe that -- if
17      you're looking at one thing, I believe it may
18      be a typo. But what I believe is officers,
19      you know, in addition to training they get on
20      Graham versus Connor, they also have various
21      force options that are available to them.
22      Training has kind of gotten away from
23      calling it a use of force continuum. They
24      call it force options because you don't have
25      to climb those options like a ladder, so you

Page 111

1  can jump ahead several options as long as it's
2  reasonable in light of factors considered in
3  Graham versus Connor.
4       In this situation, the officers pretty
5  much did climb this like a ladder: They
6  arrived so you got their presence; they used
7  verbal commands which failed; they broke a
8  window which did not involve physical contact
9  with Mr. McDaniel, he warned him that he was
10 about to break the window; and then when he
11 broke the window and unlocked the door and
12 opened it, he used what would be soft empty
13 hand control, he pulled him out of the truck
14 with great difficulty.
15      So my opinion is based on -- and their
16 testimony, based on their testimony and the
17 video evidence, I didn't see anything other
18 than soft empty hand control.
19      However, the soft empty hand control was
20 not working, so the next thing would be hard
21 empty hand control. So if they had, I believe
22 that it would have been in accordance with
23 generally accepted police practice; but I
24 don't believe that they did based on the
25 evidence that I've seen and reviewed.

Page 112

1  BY MR. FEW:
2     Q    That's a mighty long answer to tell me
3  that you agree with what I asked you, which is that
4  they didn't use hard hand control; that soft empty
5  hand control is the most use of force that was
6  applied that night.  That's part of your opinion;
7  is it not?
8     A    It is.
9     Q    Okay.  So you just referred to hard empty
10 hand control.  Did they, or did they not, use hard
11 empty hand control that might?
12    A    It is my opinion that they did not.
13    Q    But you're saying if they had used hard
14 empty control that would have been okay?
15    A    Yes.
16    Q    If they had used hard empty hand control,
17 they would know about it better than anybody
18 wouldn't they?
19         MS. COFFEE:  Object to the form.
20         THE WITNESS:  Did you say, if they had
21    used hard empty hand control they would know
22    about it?
23 BY MR. FEW:
24    Q    Right.
25    A    Correct.

Page 113

1         MR. FEW:  And they would have filled it
2    out on this form that we're looking at,
3    Response to Resistance, that I'm gonna make
4    Exhibit 11 to this deposition.
5         (Batterton Exhibit 11, Response to
6    Resistance Form, marked for identification.)
7  BY MR. FEW:
8     Q    Do you recall this document?
9     A    I do.
10    Q    To the extent that you understand this,
11 what did they say that they used on this form?
12    A    I saw it a second ago.  There was a box
13 checked for soft empty hand, but I don't see that
14 box.  There it is:  Command presence; verbal
15 command; soft empty hand control.
16    Q    So according to this, there were no
17 takedowns and there were no strikes.
18    A    That's how they have it worded -- or
19 that's how Janesky has it worded.
20    Q    Do you agree there were no takedowns?
21    A    He was pulled out the truck and pulled to
22 the ground.
23         When you look at the stuff under takedown
24 it says:  Arm bar and there wasn't an arm bar used;
25 they didn't use bent wrist that I could see; I

Page 114

1  didn't see finger locks; I didn't see shoulder
2  locks; I didn't see hammer locks; and I didn't see
3  a calf strike pull down.
4         Since I didn't see any of those, that may
5  be the things that they consider takedowns on the
6  form, so I don't know.  You would have to ask
7  Janesky why he put, "None," as opposed to not
8  writing something in, like, pulled from the truck.
9     Q    My question to you is:  Based on what you
10 know to be a takedown, based on your experience and
11 knowledge and education; and all the articles that
12 you've written; and the studying that you've done;
13 and the 57-pages of case reports that you've
14 written; did a takedown occur that night?
15    A    From the standpoint of a person who was
16 not on the ground, was put on the ground, one could
17 call it a takedown, but there is no specific -- or
18 there's no generic, I guess you'd say, term for
19 that.
20         You know, takedowns are trained.  There's
21 a single leg takedown, a double leg takedown;
22 there's a number of takedowns, so those were not
23 used in this case, so would I call it a takedown?
24         I would call it verbally -- or writing it
25 I would say -- I would articulate what I did:  I

Page 115

1  grabbed him; I took his arm; I pulled him out of
2  his truck; I placed him on the ground; or we fell
3  to the ground if it was more of an uncontrolled
4  thing where they fell to the ground -- I don't
5  remember how he worded it on here, exactly.
6         I would describe it rather than call it a
7  takedown, because it doesn't really fall into the
8  category of the takedowns that have names that are
9  trained, so it's semantics that's really not
10 relevant.
11        He articulated in his narrative what
12 happened, and he completed the form; and it's
13 recorded on body camera, so nothing's being hidden.
14    Q    So you just testified that this is all
15 semantics that's not relevant.  That's what I heard
16 you say.
17    A    That would be incorrect what you just
18 mischaracterized my statement as.
19        I said that what he did was -- it did not
20 fit into any of the boxes listed for takedowns, and
21 he described what he did in the narrative on his
22 incident report and the narrative on this.
23    Q    And this is the one that no one signed
24 off on, have they?
25        I'll scroll down for you.

Page 116

1  A  The one I saw had a sergeant's signature
2  at the bottom.
3  Q  Do you remember the date on it?
4  A  No. But you told me in the deposition a
5  couple hours ago that it was in January, I think.
6  Q  But this one is from the SLED report, and
7  this does not have a sign off from a supervisor
8  right there on page four, does it?
9  A  It doesn't. But that would actually make
10 sense if you got it from the SLED report, because
11 they would be waiting on a result of the SLED
12 investigation, so that would make sense.
13 Q  Is it your testimony that these officers
14 were required to make split-second judgments, and
15 that's why they did what they did?
16 A  My testimony is that this was a
17 split-second judgment, but that is not the sole
18 reason that this is what they did.
19 Q  Your fifth opinion says that -- I'm gonna
20 read it. This is page 24. "The Town of Blacksburg
21 Police Department's Motor Vehicle Stops/Searches,
22 Stop Arrest and Search of Persons, Response to
23 Resistance, Body Worn Camera, Internal
24 Affairs/Citizen Complaints and Training Directive
25 Policies are in accordance with generally accepted

Page 117

1  policy practice." That's what it says, right?
2  A  Correct.
3  Q  But as a part of this opinion, you don't
4  do an analysis as to whether or not the conduct
5  that night was in compliance with those policies.
6  You're just saying that these policies are good
7  policies; isn't that right?
8  A  Well, that's right. But I gave an
9  opinion as to police practice, which is the scope
10 of my job as an expert witness. So your 30(b)(6)
11 can talk the policies, I can talk about the
12 policies if you ask me about each one of them; but
13 the purview of this is me to give an opinion on
14 whether the policies are according to our standard
15 of care, and they are.
16       I'd be happy to go through all of them
17 and talk about policy, how they apply to this, if
18 you want to go there; but it's all irrelevant to
19 the issue of the use of force, other than talking
20 about the Response to Resistance Policy; but even
21 that, you can have a policy violation that does not
22 violate generally accepted police practice, because
23 generally accepted police practice is the general
24 standard of care that police officers are held to,
25 or trained to, and a police department can be more

Page 118

1  strict than that standard of care; and as such, if
2  a police department chooses to be more strict, then
3  you could have an officer that legitimately
4  violates policy but doesn't violate generally
5  accepted police practice.
6  Q  Your sixth opinion says, "The Town of
7  Blacksburg Police Department and the Town of
8  Blacksburg did not act contrary to generally
9  accepted police practices in the areas of policy,
10 custom, practice, training, and supervision
11 regarding the use of force."
12 A  Correct.
13 Q  You agree with me that if a law
14 enforcement agency has a policy that it's important
15 to review the conduct of the officers and determine
16 if the conduct is in compliance with the policy?
17 A  What was the question?
18 Q  A policy is only as good as its
19 enforcement by the supervising people at a law
20 enforcement agency; isn't that right?
21 A  Correct.
22 Q  Mr. Batterton, when was the last time you
23 were retained by anybody to testify on behalf of a
24 plaintiff?
25 A  Several years ago.

Page 119

1  Q  And approximately, how many times have
2  you been retained as an expert witness in a police
3  misconduct case?
4  A  For the plaintiff?
5  Q  No. All together.
6  A  All together, I would say -- I mean, I
7  still work full time at the police department, and
8  so this isn't a full-time thing.
9       I would say an average of 10 or 12 a
10 year.
11 Q  Over how many years?
12 A  Initially, when I started, I was only
13 getting a few a year, like three to five a year,
14 and now I may get 12 or so a year.
15 Q  Okay. When did you start giving expert
16 testimony?
17 A  I believe around 2012, roughly, give or
18 take a year or two.
19 Q  All right. And you said you did three to
20 five a year for how many years, approximately?
21 A  I didn't really get above doing three to
22 five a year until the year after COVID.
23 Q  2021?
24 A  So about 2021 is when I got busier, more
25 in the lines of 10 or 12.