**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**SPARTANBURG DIVISION**

| | | |
|---|---|---|
| Andy Lawson McDaniel, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:23-cv-01527-TMC |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| R. Todd Campbell; Darren M. Janesky; | ) | |
| Town of Blacksburg a/k/a Blacksburg | ) | |
| Police Department; Mayor Mike | ) | |
| Patterson; Police Chief Jamie P. Ham; | ) | |
| Cherokee County Sheriff's Office, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Plaintiff Andy McDaniel filed this action in state court asserting claims of, among other things, excessive force, negligence, and deliberate indifference following an altercation with law enforcement in October 2021. (ECF No. 1-1). Defendants R. Todd Campbell, Darren M. Janesky, Town of Blacksburg a/k/a Blacksburg Police Department ("the Town"), Mayor Mike Patterson, and Police Chief Jamie P. Ham (collectively "the Blacksburg Defendants") removed the case to federal court pursuant to 28 U.S.C. § 1331. (ECF No. 1). Thereafter, the Blacksburg Defendants filed a motion for summary judgment, (ECF No. 62), and Defendant Cherokee County Sheriff's Office ("CCSO") filed a motion for summary judgment, (ECF No. 63). The motions were fully briefed. (ECF Nos. 67, 69, 70). Now before the court is the magistrate judge's[1] Report and Recommendation ("Report"), recommending the district court grant the CCSO's motion for summary judgment and grant in part and deny in part the Blacksburg Defendants' motion for

---

[1] This matter was referred to a magistrate judge for pretrial handling pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(f) (D.S.C.).

summary judgment. (ECF No. 73). Plaintiff and the Blacksburg Defendants filed objections to the Report, (ECF Nos. 77 and 78), and the Blacksburg Defendants filed a reply to Plaintiff's objections, (ECF No. 79). This matter is ripe for review, and the court finds a hearing is not necessary to rule on the motions. Local Civ. Rule 7.08 (D.S.C).

## BACKGROUND

In the evening of October 23, 2021, Plaintiff rearended a motorcycle while driving in downtown Blacksburg.  (ECF No. 67-14 at 10, 12, Andy McDaniel Dep. Tr. 34:10-13, 45:2-20). Plaintiff testified during his deposition that the motorcyclist "looked fine" so Plaintiff drove away before law enforcement arrived on the scene.[2] (*Id.* at 14, Dep. Tr. 51:7-53:13). Approximately thirty minutes after striking the motorcycle, Plaintiff parked his pick-up truck on someone else's property, which is located outside of Blacksburg town limits,[3] and fell asleep. (*Id.* at 17, Dep. Tr. 63:24-64:4). Approximately three hours after the hit and run, the property owner called Cherokee County 9-1-1 and reported a suspicious vehicle parked on his property. (ECF Nos. 63-3 at 2; 67-1 at 12). Campbell, who, at the time, was an officer with the Blacksburg Police Department ("BPD"), asked if the CCSO wanted him to respond to the call as he was near the area. (ECF No. 62-11 at 3:55-4:10). CCSO employees responded yes but asked that Campbell keep the CCSO advised. (ECF Nos. 62-11 at 3:55-4:10; 63-3 at 2-3).

Campbell and Janesky, a state constable who was volunteering with the BPD, responded to the call and arrived on the scene. (ECF Nos. 63-2 at 7-8; 67-5 at 13, Darren Janesky Dep. Tr. at

---

[2] One witness testified that, after Plaintiff hit the motorcycle, "you could hear [Plaintiff] turn the corner and you could hear him mash the gas." (ECF No. 67-4 at 12, Clay Greer Dep. Tr. 38:1-4). According to the information set forth in the filings, the motorcyclist ultimately declined medical treatment and drove away. (*Id.*, Greer Dep. Tr. 37:11-13).

[3] (ECF No. 67-9 at 9, Brian Mullinax Dep. Tr. 24:2-5).

2

41:9-17). According to the dispatch radio recording filed as an exhibit to the Blacksburg Defendants' summary judgment motion, once at the property, Campbell reported he observed a male passed out in a red pickup truck and provided dispatch the license plate number for the vehicle. (ECF No. 62-11 at 6:00-30). Dispatch responded that the truck was registered to Plaintiff, (*id*. at 6:30-46), and Terrell Allen of the CCSO replied: "Be advised that subject is very combative", (ECF Nos. 62-11 at 6:51-6:54; 63-3 at 3).[4]

Though there are conflicting reports as to when Campbell turned on his body worn camera ("BWC"), the earliest footage of the incident provided to the court was taken from Janesky's BWC. That footage begins with Janesky shining his flashlight into the driver's side of the truck where Plaintiff is observed with his hands up, stating "whoa, whoa, whoa, whoa, whoa." (ECF No. 62-13). Plaintiff is asked nine times to open the door. *Id*. at 0:00:00-0:00:40. During that time, Janesky and Campbell identify themselves as police officers, and Janesky tries to break the truck's driver's side window with his flashlight. *Id*. When the flashlight breaks on impact, Janesky grabs something from Plaintiff's truck bed and uses it to break the window.[5] *Id* at 0:00:30-0:00:43. Janesky then unlocks and opens the door and pulls Plaintiff out of the truck and onto the ground where a brief scuffle ensues but is not fully visible on the BWC footage. *Id*. at 0:99:44-0:01:43. During the scuffle, Janesky commands Plaintiff to "give [him his] other hand" and to "stop resisting." *Id*.

---

[4] This statement is consistent with Plaintiff's SLED report, which reveals prior charges for, among other things, assaulting a police officer while resisting arrest, resisting arrest, and first-degree assault and battery. (ECF No. 62-9). The Town's 30(b)(6) witness also testified he knew of two prior incidents involving McDaniel fighting with law enforcement. (ECF No. 67-9 at 28, Mullinax Dep. Tr. 102:6-17).

[5] Campbell's BWC footage starts when Janesky approaches the truck's driver's side window with the object he pulled from Plaintiff's truck bed. (ECF No. 62-12). However, Campbell testified he turned his BWC on when he arrived at Bluebird Lane. (ECF No. 67-8 at 19, 21-22, Todd Campbell Dep. Tr. 64:5-6, 72:24-73:7).

Ultimately, Janesky places Plaintiff in handcuffs with Campbell's assistance. *Id*. Campbell read Plaintiff his rights, (*id*. at 0:04:42-0:05:03), and EMS was dispatched to the scene due to Plaintiff's reports of chest pain, (ECF Nos. 62-11 at 10:30-10:40; 62-12 at 4:53-5:00).

Campbell prepared an incident report wherein he provided the following statement, which reads, in relevant part:

> Upon arrival front end damage that matched the accident was observed and items missing off of the vehicle matched what was at the scene.[6] R/O Campbell and Janesky observed a W/M behind the wheel unresponsive and leaned over the steering wheel. The subject was finally awaken by R/O's and he refused to open the door and was reaching around in the truck uncooperative.[7] Efforts were made to get him to comply and due to the subject reaching around in the vehicle he was removed from the vehicle by breaking the driver window. The subject then began to fight and resist officers trying to control him. After a short struggle the subject was taken into custody. The subject was read his rights and asked about the hit and run and he said he had hit a sign on a dirt road earlier. Further questioning he adv that he got scared when he hit the motorcycle and he drove off. The subject said his chest hurt an[d] EMS was called and he was transported. The subject adv he hit a sign on a river road earlier and hit the steering wheel of his truck before he hit the motorcycle and was having chest pains from it. He went and parked on the dirt road where he was located because he was in pain and wanted to sleep it off.

(ECF No. 67-1 at 4).

---

[6] Janesky testified "Officer Campbell had a deer whistle that was found in the road, and he was able to hold it right up to the double-sided tape mark of the bumper and confirm that that was the same deer whistle that had come from that vehicle [that struck the motorcycle]. And I remember him saying, 'That's him, that's our guy.'" (ECF No. 67-5 at 23, Darren Janesky Dep. Tr. 83:14-19).

[7] As noted, the footage provided to the court does not show what transpired in the moments before Campbell and Janesky initially approach Plaintiff's truck. Further, while both Campbell's and Janesky's BWCs were on during the moments immediately leading up to when Janesky pulled Plaintiff out of the truck, the footage does not fully capture Plaintiff's movements during that time. Therefore, while it is possible Plaintiff was moving frantically in his vehicle as indicated in Campbell's report and, as will be discussed, in Janesky's report, the undersigned has reviewed both Campbell's BWC footage and Janesky's BWC footage and notes that no such movements are visible. The footage does, however, clearly show that Plaintiff grabbed on to his steering wheel to avoid being pulled from the vehicle and that Janesky and Plaintiff had a "tug of war" moment prior to Plaintiff being removed from the vehicle. (ECF No. 62-12 at 0:06-0:08).

Janesky stated in his report that:

On 10/23/2021 at 22:47 I responded to 417 Bluebird Ln Blacksburg with Officer
T. Campbell (B-5) to a 10-47 call that We were responding to a[] request for
assistance. We were advised on the radio by a County deputy that the individual in
the vehicle is known to be combative toward law enforcement[.] Upon arriving at
the scene we observed a red Chevrolet pickup truck with damage to the front of the
vehicle and a white male inside who appeared to be unconscious. Later Identified
as [Plaintiff] who was also a person of interest in a hit and run incident in
Blacksburg that was being searched for by BPD.

Upon walking up to the drivers side door and knocking on window [Plaintiff] was
awake and Both officers instructed him to "open the door" and come out and that
we were the police. [A]t this point [Plaintiff] began searching frantic[ally] in the
seat and center floor area and scrambling in an apparent effort to obtain something.
[A]fter ordering him to open the door several times I attempted to break the drivers
door window with my flashlight and broke the flashlight and did not get the glass
to break, [Plaintiff] was still searching the seat and floor area at that time and
appeared to be panicking. I searched in the bed of his truck for another object to
break the glass and found a hammer which I was able to pick up. I warned [Plaintiff]
to get back and I broke the glass, unlocked the door and attempted to pull him out.
[Plaintiff] appeared to have something in his hand and used the other arm to hold
onto the steering wheel as I pulled him out onto the ground. Once on the ground,
he would not comply with commands to stop resisting, used his arms and legs to
attempt to get free and when both officers attempted to get him face down to
handcuff him, he continually rolled over, and at one point during this struggle I felt
a strong tug on my holstered firearm. As the struggle continued T Campbell was
able to secure one arm and I secured the other, attached handcuffs and this ended
the struggle. After this [Plaintiff] requested to sit up and was expressing that he felt
chest pain where T Campbell requested EMS who arrive and [Plaintiff] requested
to go to the Hospital to be checked out. I escorted [Plaintiff] via ambulance to
Cherokee Medical Center where he received medical treatment.

(ECF No. 67-1 at 5).

Footage from Janesky's BWC shows Plaintiff telling the medical providers at Cherokee

Medical Center that his arms hurt because he "got slammed to the ground" by "the cops" and that

he heard something pop.[8] (ECF No. 62-15 at 23:00-23:25). While at the hospital, Plaintiff told

---

[8] Prior to arriving at Cherokee Medical Center, Plaintiff complained that his "left side [was]
hurting", (ECF No. 62-12 at 7:19-7:23), and stated that "something popped in [his] chest . . . when
[they] threw [him] to the ground" (ECF Nos. 62-13 at 9:40-10:01; 62-18 at 5:43-6:00).

Janesky that, in addition to striking the motorcycle, he hit a sign on River Dirt Road and his body hit the truck's steering wheel in the process. (ECF No. 62-17 at 25:10-25:40). He stated he was not sure if he injured himself when he struck the motorcycle or the sign because it happened so fast, (ECF No. 62-18 at 6:50-8:15), but he told Janesky he passed out in his truck due to pain, (ECF No. 62-17 at 26:50-26:56). According to the filings in this case, Plaintiff was ultimately diagnosed with fractured ribs, a lacerated spleen, and lung contusions.[9] (ECF No. 62-23 at 2). While hospitalized, Plaintiff submitted to a drug test, which returned positive for amphetamine and cannabinoid.[10] (ECF No. 62-16 at 1).

In his deposition, Plaintiff testified that he fell asleep in his truck approximately thirty minutes after hitting the motorcycle and woke up when law enforcement broke his window and "drug [him] out of the truck." (ECF No. 67-14 at 18, McDaniel Dep. Tr. 66:8-23). He denied ever fighting or struggling with the police. (*Id*. at 23, Dep. Tr. 87:2-12). When asked how he thought his ribs were injured he responded: "Probably, whenever they, I'm – I'm going to say, beat me when I was – when they was pulling me out of the truck, because I know I woke up in pain." (*Id*., Dep. Tr. 87:23-25). Though he clarified he could not recall being beaten or kneed by Campbell or Janesky, he believes the officers had to have done so because he did not have any injuries when he fell sleep in his truck. (*Id*. at 23-24, 48, Dep. Tr. 88:10-91:18; 187:5-8). He later testified he believes his ribs were injured when "they slammed [him] to the ground." (*Id*. at 23, Dep. Tr.

---

[9] As noted in the Report, the parties did not submit any medical records as exhibits; however, the parties do not dispute *the scope* of Plaintiff's injuries, only *the cause* of those injuries. (ECF No. 73 at 4 n.3).

[10] He also told the medical provider at Cherokee Medical Center he used marijuana on the day of the altercation and meth the day before. (ECF No. 62-15 at 24:25-24:31). However, Plaintiff testified he last used marijuana two months before the altercation, and he last used methamphetamine one week before the altercation. (ECF No. 67-14 at 11-12, McDaniel Dep. Tr. 39:13-43:6).

123:17-25). Though he admitted hitting a road sign, he testified he did so earlier in the day during his lunchbreak, not after he struck the motorcycle. (*Id*. at 15, Dep. Tr. 54:6-56:9). He denied sustaining any injuries from striking the sign, (*Id*. at 17, Dep. Tr. 62:18-23), and he denied experiencing any pain when he went to sleep following the motorcycle accident, (*Id*., Dep. Tr. 64:21-65:5). Though Campbell issued Plaintiff a traffic ticket for the hit and run, (ECF No. 67-6 at 1), the Town's 30(b)(6) witness testified that ticket was expunged or dismissed,[11] (ECF No. 67-9 at 18-19, Mullinax Dep. Tr. 63:5-9, 64:12-15).

After initiating this action, Plaintiff retained police practices expert, Anthony Kieth Morton, who offered the following opinions:

> On October 23, 2021, Officer Richard Todd Cambell and State Constable Darren Michael Janesky were both working for the Blacksburg South Carolina Police Department and failed to follow nationally recognized procedures for investigation of a traffic collision, crime scene investigation, and the use of appropriate force to arrest Andy Lawson McDaniel, and failed to follow their own Policies and Procedures.
>
> Considering the actions of Officers Campbell and Janesky, it is my opinion that they were not properly trained or deliberately did not follow the training they had received, on the national protocols for responding to calls involving proper investigations and appropriate officer conduct. Their failure to follow the nationally recognized standards and the procedures resulting in a needless escalation of events which culminated in the unreasonable and unnecessary use of force by Officer Campbell and Constable Janesky in the arrest of Andy McDaniel.
>
> . . .
>
> Concerning the level of force used by Constable Janesky and Officer Campbell to effect the arrest, it is my opinion that they created the proposed danger they faced. If these officers were afraid the accused might have a weapon, they should have approached the vehicle with measures taught at the SCCJA. At routine traffic stops, officers are taught to use tactical positions to reduce any opportunity of the violator's potential threat. Officers are taught to never stand in front of the windows

---

[11] At the deposition, the witness used the term "expunged" but then later described the ticket as having been "dismissed" several times. (ECF No. 67-9 at 18-19, Mullinax Dep. Tr. 63:5-9, 64:12-15, 66:9-13). In any event, it appears that Plaintiff was not convicted of the charge set forth in the ticket.

but to stay tactically behind the edge of the door. The BWC footage shows Janesky screaming for the accused to open the door and hitting the driver's side window with a flashlight for at least 23 seconds before anyone utters Police. It also shows the accused with his hands up even though Janesky is heard saying "show me your hands." A matter of seconds later Janesky breaks the flashlight while hitting the door glass, then gets a maul from the accused's truck bed and strikes the window twice shattering it, with the accused's hands still in the air. The accused was dragged from the truck and forced to the ground with Janesky following him to the roadway.

Although the BWC's of the officers were not activated at the same time and after the initial approach to the accused's vehicle, they do depict the accused seemingly injury free before being slammed to the ground. The accused also states that he was injured by the officers. I did not observe any movements from the accused that seemed threatening or him thrashing around like he 'could' have a weapon. In fact, the accused seemed shocked and confused and given sufficient time to comply with the officer's commands may have opened the door. It is my opinion that the contact with the officers and their use of force (UOF) caused the extensive injuries that the accused suffered. The accused was bleeding from the right side of his mouth and had scratches on his arms after he was handcuffed. It is my opinion that both officers were grossly negligent in not activating their BWC's when they arrived at the scene and that Campbell turned his camera off after only 7 minutes and 33 seconds, which is well before the incident was completed and the accused was transferred to [the] hospital.

(ECF No. 63-4 at 4-6).

The Blacksburg Defendants retained Brian S. Batterton, a police practices expert, and William Richmond, MD, a physician who has over thirty-nine years practicing emergency medicine. Batterton offered the following opinions:

[T]he hit & run investigation was conducted in accordance [with] generally accepted police practice. *Id*. at 10.

. . .

A reasonable and well-trained state constable would be consistent with generally accepted police practice and training in believing he was within his authority as a state constable when he attempted to detain [Plaintiff] outside of the town limits in furtherance of the hit and run investigation.

. . .

8

> A reasonable and well-trained officer in the position of Officer Campbell and Constable Janesky would be consistent with generally accepted police practice and training in believing that they had sufficient grounds to detain [Plaintiff] to investigate the hit and run.
>
> . . .
>
> The force used to remove [Plaintiff] from the truck and handcuff him was consistent with generally accepted police practice and training.
>
> . . .
>
> The Town of Blacksburg Police Department's Motor Vehicle Stops/Searches, Stop Arrest and Search of Persons, Response to Resistance, Body Worn Camera, Internal Affair/Citizen Complaints and Training Directive Policies are in accordance with generally accepted policy practice.
>
> . . .
>
> The Town of Blacksburg Police Department and the Town of Blacksburg did not act contrary to generally accepted police practices in the area of policy, custom, practice, training, and supervision regarding the use of force. *Id*. at 26.

(ECF No. 62-21 at 10-26).

> Dr. Richmond's report provides:
>
> [Plaintiff] had injuries to three separate organ systems, specifically his musculoskeletal (ribs), pulmonary (lungs) and lymphatic system (spleen). I cannot identify any event or events from viewing the video evidence that would explain these injuries. If we were to assume [Plaintiff's] statement that he was "slammed" to the ground to be true, this could explain injuries to his spleen and lungs but not anterior (front) and posterior (back) rib fractures. Depending on [Plaintiff's] orientation when he struck the ground, this event could explain either anterior or posterior rib fractures but not both.

(ECF No. 62-23 at 3). Dr. Richmond explained in his deposition:

> If [Plaintiff was] slammed to the ground, I assume he landed on his front or his back, and I assumed both scenarios. If he landed on the front, I can't explain – and again, I didn't see any evidence he was slammed to the ground; and number two, if he was slammed to the ground and landed on the front of his body, or anterior aspect of his body, then he could have rib fractures in front, pulmonary contusions, potentially splenic injury, but it doesn't explain the posterior rib fractures. If he lands on his back and pulmonary contusions adjacent to that, but you can't explain

9

the injuries to the anterior aspect of his body, the broken ribs to the front, the splenic injury, the pulmonary contusions.

(ECF No. 67-15 at 21, Dr. Richmond Dep. Tr. 73:18-74:9).

Having set forth the general background of this case, the court will proceed with reviewing the pending summary judgment motions under the appropriate standard as set forth below.

### STANDARD OF REVIEW

The recommendations set forth in the Report have no presumptive weight, and this court remains responsible for making a final determination in this matter. *Elijah v. Dunbar*, 66 F.4th 454, 459 (4th Cir. 2023) (citing *Mathews v. Weber*, 423 U.S. 261, 270–71 (1976)). The court is charged with making a *de novo* determination of those portions of the Report to which a specific objection is made, and the court may accept, reject, modify, in whole or in part, the recommendation of the magistrate judge or recommit the matter with instructions. 28 U.S.C. § 636(b)(1). Thus, "[t]o trigger de novo review, an objecting party 'must object to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection.'" *Elijah*, 66 F.4th at 460 (quoting *United States v. Midgette*, 478 F.3d 616, 622 (4th Cir. 2007)). However, the court need only review for clear error "those portions which are not objected to—including those portions to which only 'general and conclusory' objections have been made[.]" *Dunlap v. TM Trucking of the Carolinas, LLC*, 288 F. Supp. 3d 654, 662 (D.S.C. 2017); *see also Elijah*, 66 F.4th at 460 (noting that "[i]f a litigant objects only generally, the district court reviews the magistrate's recommendation for clear error only"). Furthermore, "'the court is not obligated to consider new arguments raised by a party for the first time in objections to the magistrate's Report.'" *Floyd v. City of Spartanburg S. Carolina*, Civ. A. No. 7:20-cv-1305-TMC, 2022 WL 796819, at *9 (D.S.C. Mar. 16, 2022) (quoting *Elliott v. Oldcastle Lawn & Garden, Inc*., No. 2:16-cv-01929-DCN, 2017 WL 1206408, at *3 (D.S.C. Mar.

31, 2017); *see also Elijah*, 66 F.4th at 460 n. 3 (noting "district court judges are not required to consider new arguments posed in objections to the magistrate's recommendation").

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Rule 56 mandates entry of summary judgment "'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Phillips v. Nlyte Software Am. Ltd*., 615 Fed. App'x 151, 152 (4th Cir. 2015) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

"'In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the nonmoving party.'" *Sellers v. Keller Unlimited LLC*, 388 F. Supp. 3d 646, 649 (D.S.C. 2019) (quoting *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1008 (4th Cir. 1996)). However, "'[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.'" *McKinney v. G4S Gov't Sols., Inc*., 711 Fed. App'x 130, 134 (4th Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party has the burden of proving that summary judgment is appropriate. *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Lane & Roderick, Inc*., 736 Fed. App'x 400 (4th Cir. 2018) (citing *Celotex Corp.*, 477 U.S. at 322-23). Once the moving party makes this showing, however, the opposing party may not rest upon mere allegations

or denials, but rather must, by affidavits or other means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c), (e); *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015).

## DISCUSSION

### I. The Blacksburg Defendants' Motion for Summary Judgment

Against one or more of the Blacksburg Defendants, Plaintiff brought causes of action for (1) alleged violations of the South Carolina Freedom of Information Act ("SC FOIA"), (2) failure to disclose evidence, (3) excessive force, (4) deliberate indifference, and (5) negligence, gross negligence, and recklessness under the South Carolina Tort Claims Act ("SCTCA"). (ECF No. 1-1 at 6-16). The Blacksburg Defendants filed a motion for summary judgment. (ECF No. 62). Plaintiff filed a response to the motion, (ECF No. 67), and the Blacksburg Defendants filed a reply, (ECF No. 69).

The magistrate judge recommends the court deny summary judgment as to Plaintiff's excessive force claim *against Janesky*, deny summary judgment as to Plaintiff's negligence claim *against the Town*, and grant summary judgment as to Plaintiff's remaining claims, including his deliberate indifference claim. (ECF No. 73). The Blacksburg Defendants object to the magistrate judge's recommendations concerning Plaintiff's excessive force claim and negligence claim. (ECF No. 77). Plaintiff objects only to the magistrate judge's recommendation concerning his deliberate indifference claim against the Town. (ECF No. 78).

### 1. The SC FOIA

Plaintiff brought a declaratory judgment cause of action asking the court to, among other things, declare the Town and the CCSO violated the SC FOIA in failing to properly respond to his SC FOIA requests. (ECF No. 1-1 at 14-15). In his response to the pending summary judgment

motions, Plaintiff provided he is voluntarily dismissing this cause of action. (ECF No. 67 at 2 n.4). However, Plaintiff did not file a stipulation with the court formally dismissing his cause of action. Accordingly, the magistrate judge recommends the district court dismiss this clam as abandoned. (ECF No. 73 at 32). Plaintiff does not object to the magistrate judge's recommendation. (ECF No. 78). As such, finding no error, clear or otherwise, the court adopts the magistrate judge's recommendation and dismisses the SC FOIA cause of action**.**

### 2. Failure to Disclose Evidence

Plaintiff filed a § 1983 claim contending the Blacksburg Defendants deliberately and intentionally withheld material evidence that would exculpate him and/or enable him to effectively impeach the testimony of the state's witnesses in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and Rule 5 of the South Carolina Rules of Criminal Procedure. (ECF No. 1-1 at 12-14). The magistrate judge found the Blacksburg Defendants are entitled to summary judgment because Plaintiff was never charged with a crime; therefore, he cannot establish prejudice as a matter of law. (ECF No. 73 at 31-32). Plaintiff does not object to the magistrate judge's findings as to this claim. (ECF No. 78). Therefore, the court must only review the magistrate judge's findings and recommendation for clear error. Having found none, the court adopts the recommendation and holds the Blacksburg Defendants are entitled to summary judgment as to this claim.

### 3. Excessive Force

Under this § 1983 claim, Plaintiff alleges Campbell and Janesky used unnecessary and excessive force against him in violation of the Fourth and Fourteenth Amendments of the United States Constitution.[12] (ECF No. 1-1 at 7).

---

[12] Further, in addition to the arguments addressed below, in their summary judgment motion, Janesky and Campbell argue Plaintiff insufficiently pled his excessive force claim as he failed to allege any individual acts taken by either defendant. (ECF No. 62 -1 at 11). The magistrate judge

With 42 U.S.C. § 1983, Congress created "a private cause of action for constitutional violations by persons acting under color of state law." *Bessellieu v. S. Carolina Dep't of Corr.*, No. 8:20-cv-3130-MGL-JDA, 2021 WL 3275897, *2 (D.S.C. July 6, 2021) *adopted by* 2021 WL 3284246 (D.S.C. July 30, 2021). The statute "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). "Accordingly, a civil action under § 1983 allows 'a party who has been deprived of a federal right under the color of state law to seek relief.'" *Bessellieu*, No. 8:20-cv-3130-MGL-JDA, 2021 WL 3275897, *2 (quoting *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999)). To establish a claim under § 1983, Plaintiff must allege a violation of a right secured by the Constitution and laws of the United States and show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

"The Fourth Amendment's prohibition on unreasonable seizures includes the right to be free of 'seizures effectuated by excessive force.'" *Smalls v. Charleston Cnty. Sheriff's Off.*, No. 2:21-cv-03713-DCN-MHC, 2023 WL 6638981, at *4 (D.S.C. Mar. 28, 2023) (quoting *Schultz v. Braga*, 455 F.3d 470, 476 (4th Cir. 2006)), *report and recommendation adopted*, No. 2:21-cv-03713-DCN, 2023 WL 5740256 (D.S.C. Sept. 6, 2023). The Supreme Court of the United States ("SCOTUS") has made clear that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis in original). Though this standard "is not

---

found there was a sufficient record to rule on the merits, and, therefore, addressed the parties' arguments on summary judgment. (ECF No. 73 at 11-12 n.7). The undersigned will also proceed with addressing merits.

capable of precise definition or mechanical application," *Bell v. Wolfish*, 441 U.S. 520, 559 (1979), "its proper application requires careful attention to the facts and circumstances of each particular case, *including* the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight", *Graham*, 490 U.S. at 396 (emphasis added). "Our inquiry into the reasonableness of the force also requires us to 'consider the facts at the moment that the challenged force was employed' 'with an eye toward the proportionality of the force in light of all the circumstances.'" *Yates v. Terry*, 817 F.3d 877, 885 (4th Cir. 2016) (quoting *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015)). "Artificial divisions in the sequence of events do not aid a court's evaluation of objective reasonableness.'" *Smith*, 781 F.3d at 101 (quoting *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005)). "Ultimately, the question to be decided is 'whether the totality of the circumstances justifie[s] a particular sort of . . . seizure.'" *Id*. (quoting *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)). "As in other Fourth Amendment contexts, . . . the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. at 396.  "At the summary judgment stage, once [the court has] viewed the evidence in the light most favorable to the nonmovant, the question of whether the officer's actions were reasonable is a question of pure law." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011).

### A. Excessive Force Claim as to Janesky

The magistrate judge recommends the court deny the motion for summary judgment as to this claim against Janesky, determining that "[b]ecause there is a dispute of material facts in the record as to whether Plaintiff was an immediate threat and whether the extent of his injuries indicate excessive force, . . . there are genuine issues of facts that preclude the Court from finding, as a matter of law, Janesky's conduct was objectively reasonable." (ECF No. 73 at 18). The Blacksburg Defendants object to this recommendation.[13] (ECF No. 77). Therefore, the court will provide a *de novo* review of this issue.

Initially, the court will address the force used in effectuating Plaintiff's arrest as there is a discrepancy in the record as to this issue. In his complaint, Plaintiff alleges Janesky used unnecessary and excessive force in smashing Plaintiff's window and removing him from his vehicle. (ECF No. 1-1 at 7). Elsewhere in his complaint, however, Plaintiff alleges he was beaten. *Id*. at 8. There is no evidence to support the latter allegation as even Plaintiff testified he could not recall being beaten or kneed by Campbell or Janesky. He explained he *believes* Campbell and Janesky beat him because he did not have any injuries when he went to sleep. (*Id*. at 23-24, 48, Dep. Tr. 88:10-91:18; 187:5-8). This conclusion, though, requires an inference that amounts to pure speculation.[14] *See Phillips v. BI-LO, LLC*, No. 3:18-cv-03229-CMC, 2019 WL 5617902, at *1 (D.S.C. Oct. 31, 2019) (explaining "[w]hile all justifiable inferences must be drawn in favor of

---

[13] Plaintiff did not file a reply to the Blacksburg Defendants' objections.

[14] To be sure, the BWC footage does not show Plaintiff being beaten. Further, Janesky testified he used soft, open hand contact with Plaintiff and did not swing, kick, or strike him, which he stated was "well within the force continuum." (ECF No. 62-8 at 13, Janesky Dep. Tr. 144:4-9). Campbell testified that he did not observe Janesky knee, kick, or elbow strike Plaintiff.  (ECF No. 62-7 at - 10, Campbell Dep. Tr. 176:1-177-6). That said, and although not seen by the undersigned, a SLED agent issued an investigative report noting, among other things, Janesky's knee was seen on Plaintiff's shoulder at the time he was being handcuffed. (ECF No. 67-11 at 8).

the non-movant, a non-moving party cannot create a genuine issue of material fact through mere speculation or the building of inference upon inference") (internal citations omitted). The evidence in this case, *interpreted in the light most favorable to Plaintiff*, establishes Janesky broke the window, pulled plaintiff out of his truck, slammed Plaintiff to the ground, and struggled with Plaintiff to handcuff him, which Plaintiff maintains was also excessive.[15] Having set forth the court's understanding of the level of force in question, the court will now address the circumstances surrounding this use of force to determine whether an objective officer would conclude that such force was reasonable.

### i.     Severity of the Crime

Plaintiff provides "the potential charge, which was never even served on [him], was for a property damage only hit-and-run, which is a misdemeanor." (ECF No. 67 at 12-13). Plaintiff is correct that, at the time Janesky pulled Plaintiff out of the vehicle, Plaintiff's potential charge was a misdemeanor under section 56-5-1220(A) of the South Carolina Code, and the magistrate judge cites multiple cases in his Report for the notion that minor traffic violations do not support the use of significant force. *See* (ECF No. 73 at 14) (citing *Yates*, 817 F.3d at 885 (wherein the Fourth Circuit Court of Appeals determined this factor weighed in favor of the plaintiff who, at the time of the challenged use of force, had allegedly committed only "minor traffic infractions", including speeding, playing his music too loudly in violation of a city ordinance, and changing lanes without a signal) and *Patrick v. City of Aiken*, No. 1:16-cv-03496, 2019 WL 4736453, *1, *6 (D.S.C. Sept. 27, 2019) (wherein the district court concluded this *Graham* factor weighed in the plaintiff's favor

---

[15] Though it is unclear from the BWC footage whether Janesky ever slammed Plaintiff to the ground, the lack of visibility of the entire incident *as well as* Plaintiff's multiple statements that he was slammed to the ground, which were made immediately following the incident as well as during his deposition, create a justifiable inference that Plaintiff was slammed on the ground.

where he was involved in a hit and run *involving a fence*, *not an occupied vehicle*, noting "the hit and run he was involved in appears to only be a misdemeanor by virtue of there not being any evidence in the record that the act resulted in injury to a person")). *See also Baney v. Town of Chapin*, No. 3:20-cv-4313-SAL-PJG, 2023 WL 11920396, *4 (D.S.C. March 9, 2023) (determining this factor weighed in the plaintiff's favor where "the crime at issue was a *nonviolent* misdemeanor" of driving with a suspended license) (emphasis added).[16] However, contrary to Plaintiff's position, the classification of his potential charge as a misdemeanor is not the only detail relevant to the court's analysis of the severity of the crime.

The crime being investigated was a hit and run resulting in property damage. Specifically, Plaintiff admits to striking *a motorcycle* with *his truck* and driving away before law enforcement arrived on the scene. It is undisputed someone was driving the motorcycle at the time of the collision. Accordingly, Plaintiff's actions demonstrated a reckless disregard for life and law and order, and Janesky was aware of this at the time he pulled Plaintiff from the very same truck that was used to hit the motorcycle *hours before*. Though not a felony, and though Janesky testified he was aware the motorcyclist denied medical treatment before he removed Plaintiff from the vehicle,[17] "a crash involving a truck versus motorcycle could have easily cause[d] serious injury"[18] and resulted in a felony charge. The fortunate fact that the motorcyclist's health was not obviously impacted from the collision does not change that. In fact, Janesky testified that, although he knew the motorcyclist declined medical attention, he "did not know if he's just injured and still just

---

[16] The parties settled the *Baney* case before the district judge ruled on the Report. *Baney*, No. 3:20-cv-4313-SAL-PJG, dkt. entry 76 (D.S.C. April 10, 2023).

[17] (ECF No. 62-8 at 9, Janesky Dep. Tr. 128:13-22).

[18] (ECF No. 62-21 at 18).

stubborn and doesn't want to go to the hospital or what". (ECF No. 67-5 at 35, Janesky Dep. Tr. 128:16-19). Thus, though technically a misdemeanor, the court finds the crime that the officers were investigating was more than a minor traffic offense and that this factor weighs more in favor of Janesky.

### ii.     Whether Plaintiff was actively resisting arrest or attempting to evade arrest by flight

BWC footage shows that, although he had his hands up for at least part of the time, Plaintiff refused to follow numerous verbal commands to open the door even after being warned that such refusal would result in Janesky breaking the window. Once the window was broken, Plaintiff continued to resist arrest by bracing himself with his right hand on the steering wheel while Janesky was attempting to pull Plaintiff out of the truck. "By doing so, Plaintiff engaged in a level of nonviolent, active resistance", which "justified some force to overcome". (ECF No. 73 at 15). Indeed, Janesky testified that, because Plaintiff was holding on to the steering wheel, Janesky had to "pull[] as hard as [he] could to separate him and [they] both went down to the ground outside of the door." (ECF No. 62-8 at 5, Janesky Dep. Tr. 86:7-12). Though the BWC footage is a bit difficult to decipher once Plaintiff and Janesky go to the ground, it is clear from the footage that Janesky verbally directs Plaintiff to "stop resisting" and to "give [Janesky] [Plaintiff's] other hand" at this time. In short, hours after evading law enforcement following the hit and run, Plaintiff resisted law enforcement at every step they took to place him under arrest. Though Plaintiff claims he did not know Campbell and Janesky were with law enforcement until he was handcuffed as he did not hear them say "police," (ECF No. 62-14 at 13-14, McDaniel Dep. Tr. 69:19-21, 70:3-5), Campbell and Janesky are heard identifying themselves as police officers and are both wearing vests with reflective text reading "Police". Nevertheless, at no point did Plaintiff acquiesce to law

enforcement's commands to open the door or to stop resisting arrest. Accordingly, this factor weighs in Janesky's favor.

### iii. Whether Plaintiff posed an immediate threat to the safety of the officers or others.

Plaintiff provides he was not an immediate threat to the safety of the officers or others because he was asleep in his truck. (ECF No. 67 at 13). Though the parties do not seem to dispute Plaintiff was passed out or unconscious when law enforcement initially approached the truck, there is no dispute that Plaintiff was awake for at least forty seconds before Janesky broke the window as he is seen on footage speaking while holding his hands up. *Plaintiff sets forth no argument as to why he was not a threat to the safety of the officers or others after he awakened.*

In contrast, in arguing Plaintiff posed an immediate threat, Janesky provides he felt threatened by, among other things, Plaintiff disobeying verbal commands and actively resisting all while knowing Plaintiff had a history of being combative. (ECF No. 62-1 at 16-17). In his deposition, Janesky explained it was dark, and he did not know if there were weapons in the vehicle. (ECF No. 67-5 at 37, Janesky Dep. Tr. 137:2-4). Nor did he know if Plaintiff was under the influence. (ECF No. 62-8 at 9, 11, Dep. Tr. 128:20-25; 130:2-4). Janesky testified there was a danger of Plaintiff running from them or running them over since Plaintiff already demonstrated he had the ability to escape earlier that day following the hit and run. (ECF No. 62-8 at 4, 10; Dep. Tr. 85:1-13, 129:6-15, 22-24). In fact, Janesky testified that, based on the way the vehicles were positioned at Bluebird Lane, Plaintiff could have driven off if he wanted to. (ECF No. 67-5 at 35-36, Dep. Tr. 130:10-19, 134:11-13). Janesky provided he was worried Plaintiff would try to get back on the road and travel into town where there were children out enjoying the festive season. (ECF No. 62-8 at 9, 11, Dep. Tr. 128:20-25; 130:2-4). Thus, he felt the first thing he needed to do was to get Plaintiff out of the vehicle, which could be a deadly weapon. (ECF No. 62-8 at 4, 10,

Dep. Tr. 85:1-13, 129:6-15, 22-24). Janesky testified that once on the ground, Plaintiff continued to avoid arrest by tucking his right arm under his abdomen area. (ECF No. 62-8 at 5, Dep. Tr. 86:13-17). Having heard Plaintiff has a history of being combative, Janesky explained it was "very, very important" Plaintiff was quickly handcuffed.  (ECF No. 62-8 at 5 Dep. Tr. 86:17-25).

The magistrate judge cited *Baney*, No. 3:20-cv-4313-SAL-PJG, 2023 WL 11920396, in support of his finding that there is a genuine issue of material fact which precludes the court from concluding as a matter of law whether an officer in Janesky's position could reasonably perceive Plaintiff as a threat. (ECF No. 73 at 17). In that case, Officer Gainous responded to a report of a suspicious vehicle parked on a grassy area of a shopping center parking lot. *Baney*, No. 3:20-cv-4313-SAL-PJG ,2023 WL 11920396, *1. On his initial approach to the vehicle, Gainous asked Baney to park his vehicle on a different portion of the parking lot, and Baney acquiesced. *Id*. After getting back to his patrol car, Gainous "radioed in" Baney's license tag number and moved his patrol vehicle behind the store at which time he was informed Baney had a suspended license. *Id*. at *2. Accordingly, Gainous drove back into the parking lot and initiated a traffic stop for driving under suspension. *Id*.

When Gainous approached Baney's vehicle a second time, he directed Baney to step out of the vehicle as he was under arrest for driving under suspension. *Baney*, No. 3:20-cv-4313-SAL-PJG, 2023 WL 11920396, *2. The below exchange followed:

> Gainous opened the driver's side door. Baney responded "driving under suspension" with the inflection of a question. Gainous, talking over Baney, directed him to "step out now you're under arrest." Baney raised a finger as if he sought to pose a question or ask for a moment to respond, and Gainous directed, "Step out or I'm going to tase you, step out now." Baney turned to look at his wife and Gainous reached for Baney's arm and attempted to pull him out of the car. Baney stated "okay" but also pulled his arm free from Gainous's grip. Gainous yelled "Get out the car" and Baney, with his right hand on the steering wheel and left hand to his side, yelled back "let me f******—." But before Baney could finish his sentence, Gainous took out his taser, pointed it at Baney, and shot him with taser darts that

> applied a shock for five seconds, causing Baney to fall out of the car and onto the
> ground.

*Id*. Baney brought an excessive force claim, and, in finding the *Graham* factors weighed in his favor, the magistrate judge noted the following: (1) only ten seconds passed from Gainous informing Baney he was under arrest and trying to pull Baney from the car and threatening him with a taser, (2) a reasonable jury could conclude that Baney's noncompliance and resistance was brief, minimal, and justified as Baney indicated he was confused by the situation, did not know his license was under suspension, and asked for an explanation but Gainous refused to provide one, (3) Gainous gave Baney "almost no chance" to comply with his orders, which rapidly escalated without apparent cause; and (4) a reasonable jury could conclude that Baney posed no threat to Gainous, and that Gainous could not have reasonably believed that he did. *Id*. at *4-7.

Here, like in *Baney*, the interaction between Plaintiff and Janesky prior to the use of force was brief. Also like in *Baney*, Plaintiff initially seemed confused by law enforcement's presence, and Janesky did not set forth his explanation for demanding Plaintiff open the door. However, unlike in *Baney*, Plaintiff was given more time to comply with law enforcement's commands, Plaintiff was known to be combative, and Plaintiff was the suspect in a hit and run accident from earlier in the evening, which was more substantial than driving under suspension. Importantly, the use of force in *Baney* was even greater than that utilized here, despite the circumstances surrounding the use of force being more compelling in this case. While another officer may have given Plaintiff more time to acquiesce before employing force, that does not render Janesky's use of force unreasonable under the totality of the circumstances. As Janesky stated during his deposition: "If we get into a negotiation, things can turn quickly. The more time that we give a suspect, to think and decide what he wants to do, the more opportunity and advantage he has over law enforcement. When you take action against someone you need to be swift." (ECF No. 67-5 at

37, Janesky Dep. Tr. 137:7-12). Thus, the court finds the case at hand is sufficiently distinguishable from *Baney*.

The court's analysis of the of the *Graham* factors when measured against the level of force used against Plaintiff leads the undersigned to conclude that such force was objectively reasonable in light of the totality of the circumstances in this case. Accordingly, the court finds that Janesky is entitled to summary judgment as to this claim.

### B.     Excessive Force Claim as to Campbell

The magistrate judge determined Campbell is entitled to summary judgment as to the excessive force claim because Plaintiff has failed to point to evidence showing that it was Campbell who used excessive force. (ECF No. 73 at 12-13). Plaintiff does not object to the magistrate judge's recommendation that the court enter summary judgment in favor of Campbell as to the excessive force claim. (ECF No. 78). Accordingly, the court must only review the magistrate judge's recommendation for clear error. Having found none, the court agrees with and adopts the magistrate judge's recommendation that summary judgment be entered in favor of Campbell.

### 4. Deliberate Indifference

Plaintiff also brought a § 1983 claim for deliberate indifference against Chief Ham, Mayor Patterson, and the Town/BPD. (ECF No. 1-1 at 8-12). As discussed, to establish a § 1983 claim, a plaintiff must identify which constitutional right was violated by the defendants' conduct. *West*, 487 U.S. at 48. Plaintiff failed to identify in his complaint which constitutional right was violated as a result of the defendants' alleged deliberate indifference.[19] That said, from reviewing the one

---

[19] *See* (ECF No. 1-1 at 9-12) (where Plaintiff vaguely refers to the violations of his constitutional rights).

paragraph he dedicated to this cause of action in his response in opposition to the motions for summary judgment, the court construes Plaintiff's deliberate indifference claim as asserting that Campbell and Janesky would not have violated his Fourth Amendment right to be free from seizures effectuated by excessive force but for the defendants' failure to properly train its employees and agents and enforce the Town's policies. (ECF No. 67 at 15). As stated herein, however, the court finds Plaintiff has failed to establish a Fourth Amendment violation for excessive force as to any defendant. Therefore, Plaintiff's deliberate indifference claim must likewise fail. Accordingly, the court grants the Blacksburg Defendants summary judgment as to the deliberate indifference claim.

5. **Negligence, Gross Negligence, and Recklessness Cause of Action Against the Town**[20]

In light of the court's ruling on the aforementioned claims, the only remaining claim as to the Blacksburg Defendants in this action is Plaintiff's claim brought under the SCTCA. (ECF No. 1-1 at 8). As such, the court has the authority to decline to exercise supplemental jurisdiction over such claim and remand it to state court. *See* 28 U.S.C. § 1367(c)(3) (granting the court the authority to decline supplemental jurisdiction over state law claims if it has dismissed all claims over which it has original jurisdiction). Having reviewed the factors set forth in *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995), the court finds remanding the SCTCA claim appropriate here as South Carolina state courts have more knowledge and experience in adjudicating SCTCA claims, and the State of South Carolina has an interest in resolving Plaintiff's claim under state law.

---

[20] Plaintiff also brought this cause of action against the CCSO. The court addresses this claim as it relates to the CCSO in a separate section below.

24

## II. The CCSO's Motion for Summary Judgment

Against the CCSO, Plaintiff brought claims for negligence, deliberate indifference, failure to disclose evidence, and a declaratory judgment action seeking a declaration that the CCSO violated the SC FOIA. (ECF No. 1-1 a 7-15). Plaintiff voluntarily dismissed his deliberate indifference and failure to disclose evidence claims against the CCSO. (ECF No. 59). Therefore, with his SC FOIA claim also having been dismissed as set forth above, the only remaining claim against the CCSO is Plaintiff's claim for negligence, gross negligence, and recklessness, which is hereby remanded to state court as set forth herein. Accordingly, the CCSO's motion is dismissed without prejudice to any relief it may seek as to this claim in state court

## CONCLUSION

For the reasons set forth herein, the court **ACCEPTS IN PART AND REJECTS IN PART** the Report (ECF No. 73), **GRANTS IN PART AND DISMISSES IN PART** the Blacksburg Defendants' motion for summary judgment (ECF No. 62), and **DISMISSES** the CCSO's motion for summary judgment, (ECF No. 63). The court declines to exercise supplemental jurisdiction over Plaintiff's SCTCA claim and such claim is hereby **REMANDED** to state court.

**IT IS SO ORDERED.**

s/Timothy M. Cain
Chief United States District Judge

Anderson, South Carolina
September 29, 2025

## NOTICE OF RIGHT TO APPEAL

The parties are hereby notified of the right to appeal this order pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure.