**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION**

| | | |
|---|---|---|
| Andy Lawson McDaniel, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:23-cv-01527-TMC |
| | ) | |
| v. | ) | **ORDER ON RECONSIDERATION** |
| | ) | |
| R. Todd Campbell; Darren M. Janesky; | ) | |
| Town of Blacksburg a/k/a Blacksburg | ) | |
| Police Department; Mayor Mike | ) | |
| Patterson; Police Chief Jamie P. Ham; | ) | |
| Cherokee County Sheriff's Office, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the court on Plaintiff Andy McDaniel's motion requesting reconsideration of the portions of the order filed at ECF No. 82 that granted summary judgment against Plaintiff on his excessive force claim brought pursuant to 42 U.S.C. § 1983 and on Plaintiff's § 1983 deliberate indifference claim.[1] (ECF No. 89). For the reasons set forth below, the court **GRANTS** in part and **DENIES** in part Plaintiff's motion. Plaintiff's request that the court reconsider its prior rulings on these claims is **GRANTED**. However, having carefully reviewed the arguments in Plaintiff's motion and reconsidered anew the provisions of the prior order at issue, the court **DENIES** Plaintiff's request to reinstate such claims.

As stated in the court's order filed at ECF No. 82, Plaintiff filed this action in state court asserting claims of, among other things, excessive force, negligence, and deliberate indifference following an altercation with law enforcement in October 2021. (ECF No. 1-1). Defendants R.

---

[1] Upon review of the parties' briefs, the court finds that a hearing is unnecessary. Local Civ. Rule 7.08 (D.S.C.).

Todd Campbell, Darren M. Janesky, Town of Blacksburg a/k/a Blacksburg Police Department ("the Town"), Mayor Mike Patterson, and Police Chief Jamie P. Ham (collectively "the Blacksburg Defendants") removed the case to federal court pursuant to 28 U.S.C. § 1331. (ECF No. 1). Thereafter, the Blacksburg Defendants filed a motion for summary judgment, (ECF No. 62), and Defendant Cherokee County Sheriff's Office ("CCSO") filed a motion for summary judgment, (ECF No. 63). The motions were fully briefed. (ECF Nos. 67, 69, 70). The magistrate judge[2] issued a Report and Recommendation ("Report"), recommending the district court grant the CCSO's motion for summary judgment and grant in part and deny in part the Blacksburg Defendants' motion for summary judgment. (ECF No. 73). The court issued an order ruling on the Report and summary judgment motions. (ECF No. 82). The CCSO filed motions asking the court to reconsider portions of its order. (ECF Nos. 86, 87, 88, 92, 93). The court addressed these unopposed motions by its order filed at ECF No. 100. Accordingly, the court limits its discussion herein to the claims against the Blacksburg Defendants that are the subject of the instant motion to reconsider, and its below analysis of those claims shall supersede that set forth in its order at ECF No. 82.[3]

## BACKGROUND

In the evening of October 23, 2021, Plaintiff rearended a motorcycle while driving in downtown Blacksburg. (ECF No. 67-14 at 10, 12, Andy McDaniel Dep. Tr. 34:10-13, 45:2-20). Plaintiff testified during his deposition that the motorcyclist "looked fine" so Plaintiff drove away

---

[2] This matter was referred to a magistrate judge for pretrial handling pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(f) (D.S.C.).

[3] Plaintiff does not ask this court to reconsider its ruling on his SC FOIA claim or his Failure to Disclose Evidence claim. Accordingly, the court need not discuss those claims herein and those portions of the order at ECF No. 82 remain in effect.

before law enforcement arrived on the scene.[4] (*Id.* at 14, Dep. Tr. 51:7-53:13). Approximately thirty minutes after striking the motorcycle, Plaintiff parked his pick-up truck on someone else's property, which is located outside of Blacksburg town limits,[5] and fell asleep. (*Id*. at 17, Dep. Tr. 63:24-64:4). Approximately three hours after the hit and run, the property owner called Cherokee County 9-1-1 and reported a suspicious vehicle parked on his property. (ECF Nos. 63-3 at 2; 67-1 at 12). Campbell, who, at the time, was an officer with the Blacksburg Police Department ("BPD"), asked if the CCSO wanted him to respond to the call as he was near the area. (ECF No. 62-11 at 3:55-4:10). The CCSO employees responded yes but asked that Campbell keep the CCSO advised. (ECF Nos. 62-11 at 3:55-4:10; 63-3 at 2-3).

Campbell and Janesky, a state constable who was volunteering with the BPD, responded to the call and arrived on the scene. (ECF Nos. 63-2 at 7-8; 67-5 at 13, Darren Janesky Dep. Tr. at 41:9-17). According to the dispatch radio recording filed as an exhibit to the Blacksburg Defendants' summary judgment motion, once at the property, Campbell reported he observed a male passed out in a red pickup truck and provided dispatch the license plate number for the vehicle. (ECF No. 62-11 at 6:00-30). Dispatch responded that the truck was registered to Plaintiff, (*id*. at 6:30-46), and Terrell Allen of the CCSO replied: "Be advised that subject is very combative," (ECF Nos. 62-11 at 6:51-6:54; 63-3 at 3).[6]

---

[4] One witness testified that, after Plaintiff hit the motorcycle, "you could hear [Plaintiff] turn the corner and you could hear him mash the gas." (ECF No. 67-4 at 12, Clay Greer Dep. Tr. 38:1-4). According to the information set forth in the filings, the motorcyclist ultimately declined medical treatment and drove away. (*Id.*, Greer Dep. Tr. 37:11-13).

[5] (ECF No. 67-9 at 9, Brian Mullinax Dep. Tr. 24:2-5).

[6] This statement is consistent with Plaintiff's SLED report, which reveals prior charges for, among other things, assaulting a police officer while resisting arrest, resisting arrest, and first-degree assault and battery. (ECF No. 62-9). The Town's 30(b)(6) witness also testified he knew of two

Though there are conflicting reports as to when Campbell turned on his body worn camera ("BWC"), the earliest footage of the incident provided to the court was taken from Janesky's BWC. That footage begins with Janesky shining his flashlight into the driver's side of the truck where Plaintiff is observed with his hands up, stating "whoa, whoa, whoa, whoa, whoa." (ECF No. 62-13). Plaintiff can also be heard asking "what did I do?" (ECF No. 62-13, 0:00:16-:17). Plaintiff is asked nine times to open the door. *Id*. at 0:00:00-0:00:40. During that time, Janesky and Campbell identify themselves as police officers, and Janesky tries to break the truck's driver's side window with his flashlight. *Id*. When the flashlight breaks on impact, Janesky grabs something from Plaintiff's truck bed and uses it to break the window.[7] *Id* at 0:00:30-0:00:43. Janesky then unlocks and opens the door and pulls Plaintiff out of the truck and onto the ground where a brief scuffle ensues but is not fully visible on the BWC footage. *Id*. at 0:99:44-0:01:43. During the scuffle, Janesky commands Plaintiff to "give [him his] other hand" and to "stop resisting." *Id*. Ultimately, Janesky places Plaintiff in handcuffs with Campbell's assistance. *Id*. Campbell read Plaintiff his rights, (*id*. at 0:04:42-0:05:03), and EMS was dispatched to the scene due to Plaintiff's reports of chest pain, (ECF Nos. 62-11 at 10:30-10:40; 62-12 at 4:53-5:00).

Campbell prepared an incident report wherein he provided the following statement, which reads, in relevant part:

---

prior incidents involving McDaniel fighting with law enforcement. (ECF No. 67-9 at 28, Mullinax Dep. Tr. 102:6-17).

[7] Campbell's BWC footage starts when Janesky approaches the truck's driver's side window with the object he pulled from Plaintiff's truck bed. (ECF No. 62-12). However, Campbell testified he turned his BWC on when he arrived at Bluebird Lane. (ECF No. 67-8 at 19, 21-22, Todd Campbell Dep. Tr. 64:5-6, 72:24-73:7).

Upon arrival front end damage that matched the accident was observed and items missing off of the vehicle matched what was at the scene.[8] R/O Campbell and Janesky observed a W/M behind the wheel unresponsive and leaned over the steering wheel. The subject was finally awaken[ed] by R/O's and he refused to open the door and was reaching around in the truck uncooperative.[9] Efforts were made to get him to comply and due to the subject reaching around in the vehicle he was removed from the vehicle by breaking the driver window. The subject then began to fight and resist officers trying to control him. After a short struggle the subject was taken into custody. The subject was read his rights and asked about the hit and run and he said he had hit a sign on a dirt road earlier. Further questioning he adv that he got scared when he hit the motorcycle and he drove off. The subject said his chest hurt an[d] EMS was called and he was transported. The subject adv he hit a sign on a river road earlier and hit the steering wheel of his truck before he hit the motorcycle and was having chest pains from it. He went and parked on the dirt road where he was located because he was in pain and wanted to sleep it off.

(ECF No. 67-1 at 4).

Janesky stated in his report that:

On 10/23/2021 at 22:47 I responded to 417 Bluebird Ln Blacksburg with Officer T. Campbell (B-5) to a 10-47 call that We were responding to a[] request for assistance. We were advised on the radio by a County deputy that the individual in the vehicle is known to be combative toward law enforcement[.] Upon arriving at the scene we observed a red Chevrolet pickup truck with damage to the front of the vehicle and a white male inside who appeared to be unconscious. Later Identified as [Plaintiff] who was also a person of interest in a hit and run incident in Blacksburg that was being searched for by BPD.

---

[8] Janesky testified "Officer Campbell had a deer whistle that was found in the road, and he was able to hold it right up to the double-sided tape mark of the bumper and confirm that that was the same deer whistle that had come from that vehicle [that struck the motorcycle]. And I remember him saying, 'That's him, that's our guy.'" (ECF No. 67-5 at 23, Darren Janesky Dep. Tr. 83:14-19).

[9] As noted, the footage provided to the court does not show what transpired in the moments before Campbell and Janesky initially approach Plaintiff's truck. Further, while both Campbell's and Janesky's BWCs were on during the moments immediately leading up to when Janesky pulled Plaintiff out of the truck, the footage does not fully capture Plaintiff's movements during that time. Therefore, while it is possible Plaintiff was moving frantically in his vehicle as indicated in Campbell's report and, as will be discussed, in Janesky's report, the undersigned has reviewed both Campbell's BWC footage and Janesky's BWC footage and notes that no such movements are visible. The footage does, however, clearly show that Plaintiff grabbed on to his steering wheel to avoid being pulled from the vehicle and that Janesky and Plaintiff had a "tug of war" moment prior to Plaintiff being removed from the vehicle. (ECF No. 62-12 at 0:06-0:08).

> Upon walking up to the drivers side door and knocking on window [Plaintiff] was awake and Both officers instructed him to "open the door" and come out and that we were the police. [A]t this point [Plaintiff] began searching frantic[ally] in the seat and center floor area and scrambling in an apparent effort to obtain something. [A]fter ordering him to open the door several times I attempted to break the drivers door window with my flashlight and broke the flashlight and did not get the glass to break, [Plaintiff] was still searching the seat and floor area at that time and appeared to be panicking. I searched in the bed of his truck for another object to break the glass and found a hammer which I was able to pick up. I warned [Plaintiff] to get back and I broke the glass, unlocked the door and attempted to pull him out. [Plaintiff] appeared to have something in his hand and used the other arm to hold onto the steering wheel as I pulled him out onto the ground. Once on the ground, he would not comply with commands to stop resisting, used his arms and legs to attempt to get free and when both officers attempted to get him face down to handcuff him, he continually rolled over, and at one point during this struggle I felt a strong tug on my holstered firearm. As the struggle continued T Campbell was able to secure one arm and I secured the other, attached handcuffs and this ended the struggle. After this [Plaintiff] requested to sit up and was expressing that he felt chest pain where T Campbell requested EMS who arrive and [Plaintiff] requested to go to the Hospital to be checked out. I escorted [Plaintiff] via ambulance to Cherokee Medical Center where he received medical treatment.

(ECF No. 67-1 at 5).

Footage from Janesky's BWC shows Plaintiff telling the medical providers at Cherokee Medical Center that his arms hurt because he "got slammed to the ground" by "the cops" and that he heard something pop.[10] (ECF No. 62-15 at 23:00-23:25). While at the hospital, Plaintiff told Janesky that, in addition to striking the motorcycle, he hit a sign on River Dirt Road and his body hit the truck's steering wheel in the process. (ECF No. 62-17 at 25:10-25:40). He stated he was not sure if he injured himself when he struck the motorcycle or the sign because it happened so fast, (ECF No. 62-18 at 6:50-8:15), but he told Janesky he passed out in his truck due to pain, (ECF No. 62-17 at 26:50-26:56). According to the filings in this case, Plaintiff was ultimately diagnosed

---

[10] Prior to arriving at Cherokee Medical Center, Plaintiff complained that his "left side [was] hurting", (ECF No. 62-12 at 7:19-7:23), and stated that "something popped in [his] chest . . . when [they] threw [him] to the ground" (ECF Nos. 62-13 at 9:40-10:01; 62-18 at 5:43-6:00).

with fractured ribs, a lacerated spleen, and lung contusions.[11] (ECF No. 62-23 at 2). While hospitalized, Plaintiff submitted to a drug test, which returned positive for amphetamine and cannabinoid.[12] (ECF No. 62-16 at 1).

In his deposition, Plaintiff testified that he fell asleep in his truck approximately thirty minutes after hitting the motorcycle and woke up when law enforcement broke his window and "drug [him] out of the truck." (ECF No. 67-14 at 18, McDaniel Dep. Tr. 66:8-23). He denied ever fighting or struggling with the police. (*Id.* at 23, Dep. Tr. 87:2-12). When asked how he thought his ribs were injured, he responded: "Probably, whenever they, I'm – I'm going to say, beat me when I was – when they was pulling me out of the truck, because I know I woke up in pain." (*Id.*, Dep. Tr. 87:23-25). Though he clarified he could not recall being beaten or kneed by Campbell or Janesky, he believes the officers had to have done so because he did not have any injuries when he fell asleep in his truck. (*Id.* at 23-24, 48, Dep. Tr. 88:10-91:18; 187:5-8). He later testified he believes his ribs were injured when "they slammed [him] to the ground." (*Id.* at 23, Dep. Tr. 123:17-25). While he admitted hitting a road sign, he testified he did so earlier in the day during his lunchbreak, not after he struck the motorcycle. (*Id.* at 15, Dep. Tr. 54:6-56:9). He denied sustaining any injuries from striking the sign, (*Id.* at 17, Dep. Tr. 62:18-23), and he denied experiencing any pain when he went to sleep following the motorcycle accident, (*Id.*, Dep. Tr. 64:21-65:5). Though Campbell issued Plaintiff a traffic ticket for the hit and run, (ECF No. 67-6

---

[11] As noted in the Report, the parties did not submit any medical records as exhibits; however, the parties do not dispute *the scope* of Plaintiff's injuries, only *the cause* of those injuries. (ECF No. 73 at 4 n.3).

[12] Plaintiff told the medical provider at Cherokee Medical Center he used marijuana on the day of the altercation and meth the day before. (ECF No. 62-15 at 24:25-24:31). However, Plaintiff testified he last used marijuana two months before the altercation, and he last used methamphetamine one week before the altercation. (ECF No. 67-14 at 11-12, McDaniel Dep. Tr. 39:13-43:6).

at 1), the Town's 30(b)(6) witness testified that ticket was expunged or dismissed,[13] (ECF No. 67-9 at 18-19, Mullinax Dep. Tr. 63:5-9, 64:12-15).

After initiating this action, Plaintiff retained police practices expert, Anthony Kieth Morton, who offered the following opinions:

> On October 23, 2021, Officer Richard Todd Cambell and State Constable Darren Michael Janesky were both working for the Blacksburg South Carolina Police Department and failed to follow nationally recognized procedures for investigation of a traffic collision, crime scene investigation, and the use of appropriate force to arrest Andy Lawson McDaniel, and failed to follow their own Policies and Procedures.
>
> Considering the actions of Officers Campbell and Janesky, it is my opinion that they were not properly trained or deliberately did not follow the training they had received, on the national protocols for responding to calls involving proper investigations and appropriate officer conduct. Their failure to follow the nationally recognized standards and the procedures resulting in a needless escalation of events which culminated in the unreasonable and unnecessary use of force by Officer Campbell and Constable Janesky in the arrest of Andy McDaniel.
>
> . . .
>
> Concerning the level of force used by Constable Janesky and Officer Campbell to effect the arrest, it is my opinion that they created the proposed danger they faced. If these officers were afraid the accused might have a weapon, they should have approached the vehicle with measures taught at the SCCJA. At routine traffic stops, officers are taught to use tactical positions to reduce any opportunity of the violator's potential threat. Officers are taught to never stand in front of the windows but to stay tactically behind the edge of the door. The BWC footage shows Janesky screaming for the accused to open the door and hitting the driver's side window with a flashlight for at least 23 seconds before anyone utters Police. It also shows the accused with his hands up even though Janesky is heard saying "show me your hands." A matter of seconds later Janesky breaks the flashlight while hitting the door glass, then gets a maul from the accused's truck bed and strikes the window twice shattering it, with the accused's hands still in the air. The accused was dragged from the truck and forced to the ground with Janesky following him to the roadway.

---

[13] At the deposition, the witness used the term "expunged" but then later described the ticket as having been "dismissed" several times. (ECF No. 67-9 at 18-19, Mullinax Dep. Tr. 63:5-9, 64:12-15, 66:9-13). In any event, it appears that Plaintiff was not convicted of the charge set forth in the ticket.

Although the BWC's of the officers were not activated at the same time and after the initial approach to the accused's vehicle, they do depict the accused seemingly injury free before being slammed to the ground. The accused also states that he was injured by the officers. I did not observe any movements from the accused that seemed threatening or him thrashing around like he 'could' have a weapon. In fact, the accused seemed shocked and confused and given sufficient time to comply with the officer's commands may have opened the door. It is my opinion that the contact with the officers and their use of force (UOF) caused the extensive injuries that the accused suffered. The accused was bleeding from the right side of his mouth and had scratches on his arms after he was handcuffed. It is my opinion that both officers were grossly negligent in not activating their BWC's when they arrived at the scene and that Campbell turned his camera off after only 7 minutes and 33 seconds, which is well before the incident was completed and the accused was transferred to [the] hospital.

(ECF No. 63-4 at 4-6).

The Blacksburg Defendants retained Brian S. Batterton, a police practices expert, and William Richmond, MD, a physician who has over thirty-nine years practicing emergency medicine. Batterton offered the following opinions:

[T]he hit & run investigation was conducted in accordance [with] generally accepted police practice. *Id.* at 10.

. . .

A reasonable and well-trained state constable would be consistent with generally accepted police practice and training in believing he was within his authority as a state constable when he attempted to detain [Plaintiff] outside of the town limits in furtherance of the hit and run investigation.

. . .

A reasonable and well-trained officer in the position of Officer Campbell and Constable Janesky would be consistent with generally accepted police practice and training in believing that they had sufficient grounds to detain [Plaintiff] to investigate the hit and run.

. . .

The force used to remove [Plaintiff] from the truck and handcuff him was consistent with generally accepted police practice and training.

. . .

9

The Town of Blacksburg Police Department's Motor Vehicle Stops/Searches, Stop Arrest and Search of Persons, Response to Resistance, Body Worn Camera, Internal Affair/Citizen Complaints and Training Directive Policies are in accordance with generally accepted policy practice.

. . .

The Town of Blacksburg Police Department and the Town of Blacksburg did not act contrary to generally accepted police practices in the area of policy, custom, practice, training, and supervision regarding the use of force. *Id*. at 26.

(ECF No. 62-21 at 10-26).

Dr. Richmond's report provides:

[Plaintiff] had injuries to three separate organ systems, specifically his musculoskeletal (ribs), pulmonary (lungs) and lymphatic system (spleen). I cannot identify any event or events from viewing the video evidence that would explain these injuries. If we were to assume [Plaintiff's] statement that he was "slammed" to the ground to be true, this could explain injuries to his spleen and lungs but not anterior (front) and posterior (back) rib fractures. Depending on [Plaintiff's] orientation when he struck the ground, this event could explain either anterior or posterior rib fractures but not both.

(ECF No. 62-23 at 3). Dr. Richmond explained in his deposition:

If [Plaintiff was] slammed to the ground, I assume he landed on his front or his back, and I assumed both scenarios. If he landed on the front, I can't explain – and again, I didn't see any evidence he was slammed to the ground; and number two, if he was slammed to the ground and landed on the front of his body, or anterior aspect of his body, then he could have rib fractures in front, pulmonary contusions, potentially splenic injury, but it doesn't explain the posterior rib fractures. If he lands on his back and pulmonary contusions adjacent to that, but you can't explain the injuries to the anterior aspect of his body, the broken ribs to the front, the splenic injury, the pulmonary contusions.

(ECF No. 67-15 at 21, Dr. Richmond Dep. Tr. 73:18-74:9).

Having set forth the general background of this case, the court will proceed with reviewing the pending motion to reconsider under the appropriate standard as set forth below.

10

**STANDARD OF REVIEW**

## I.     The Report.

The recommendations set forth in the Report have no presumptive weight, and this court remains responsible for making a final determination in this matter. *Elijah v. Dunbar*, 66 F.4th 454, 459 (4th Cir. 2023) (citing *Mathews v. Weber*, 423 U.S. 261, 270–71 (1976)). The court is charged with making a *de novo* determination of those portions of the Report to which a specific objection is made, and the court may accept, reject, modify, in whole or in part, the recommendation of the magistrate judge or recommit the matter with instructions. 28 U.S.C. § 636(b)(1). Thus, "[t]o trigger de novo review, an objecting party 'must object to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection.'" *Elijah*, 66 F.4th at 460 (quoting *United States v. Midgette*, 478 F.3d 616, 622 (4th Cir. 2007)). However, the court need only review for clear error "those portions which are not objected to—including those portions to which only 'general and conclusory' objections have been made[.]" *Dunlap v. TM Trucking of the Carolinas, LLC*, 288 F. Supp. 3d 654, 662 (D.S.C. 2017); *see also Elijah*, 66 F.4th at 460 (noting that "[i]f a litigant objects only generally, the district court reviews the magistrate's recommendation for clear error only"). Furthermore, "'the court is not obligated to consider new arguments raised by a party for the first time in objections to the magistrate's Report.'" *Floyd v. City of Spartanburg S. Carolina*, Civ. A. No. 7:20-cv-1305-TMC, 2022 WL 796819, at *9 (D.S.C. Mar. 16, 2022) (quoting *Elliott v. Oldcastle Lawn & Garden, Inc.*, No. 2:16-cv-01929-DCN, 2017 WL 1206408, at *3 (D.S.C. Mar. 31, 2017); *see also Elijah*, 66 F.4th at 460 n. 3 (noting "district court judges are not required to consider new arguments posed in objections to the magistrate's recommendation").

## II.     Summary Judgment.

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  Rule 56 mandates entry of summary judgment "'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Phillips v. Nlyte Software Am. Ltd.*, 615 Fed. App'x 151, 152 (4th Cir. 2015) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

"'In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the nonmoving party.'" *Sellers v. Keller Unlimited LLC*, 388 F. Supp. 3d 646, 649 (D.S.C. 2019) (quoting *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1008 (4th Cir. 1996)).  However, "'[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.'" *McKinney v. G4S Gov't Sols., Inc.*, 711 Fed. App'x 130, 134 (4th Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The moving party has the burden of proving that summary judgment is appropriate. *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Lane & Roderick, Inc.*, 736 Fed. App'x 400 (4th Cir. 2018) (citing *Celotex Corp.*, 477 U.S. at 322-23).  Once the moving party makes this showing, however, the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth specific

12

facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c), (e); *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015).

## III.    Reconsideration.

Rule 59 states "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." Fed. R. Civ. P. 59(e). "Although Rule 59(e) does not itself provide a standard under which a district court may grant a motion to alter or amend a judgment, [the Fourth Circuit Court of Appeals] ha[s] . . . recognized that there are three grounds for amending an earlier judgment: (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Pac. Ins. Co. v. Am. Nat. Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998). Here, Plaintiff appears to base his motion on the second and third ground. (ECF Nos. 89). Though he points to a number of facts in the record he alleges create "a genuine issue of fact," Plaintiff has failed to identify any *new* evidence not before the court at the time of its order. *See* (ECF No. 89) (wherein Plaintiff discusses, among other things, whether there was a genuine issue of fact as to whether he knew it was the police who were breaking his truck's window). Accordingly, the motion is denied to the extent Plaintiff seeks reconsideration to account for new evidence that was previously unavailable.

As to the remaining ground for reconsideration, that is, whether reconsideration is necessary to correct a clear error of law or prevent manifest injustice, Plaintiff takes issue with the court's discussion of *Baney v. Town of Chapin*, No. 3:20-cv-4313-SAL-PJG, 2023 WL 11920396, *4 (D.S.C. March 9, 2023) and with the court's analysis of the evidence in the record. For example, in its excessive force analysis, Plaintiff argues the court failed to consider Plaintiff's allegation that Janesky kneed him during the altercation that resulted in Plaintiff being handcuffed. *Id*. at 2.

13

He also maintains that the factual disputes amongst the parties warrant sending this matter to a jury. *Id*. Specifically, Plaintiff contends there is a "genuine issue of fact as to whether . . . he knew the persons smashing out his driver's side truck window . . . were law enforcement/police." *Id*. at 1. Accordingly, the court finds it appropriate to **GRANT IN PART** Plaintiff's motion for reconsideration and revisit those portions of its order ruling on Plaintiff's § 1983 claims. Additionally, because the court's rulings on the § 1983 claims impact its ruling on the South Carolina Tort Claims Act ("SCTCA") claim against the Blacksburg Defendants, the court will touch on that claim as well.

## DISCUSSION

At issue in the instant motion for reconsideration are Plaintiff's claims against one or more of the Blacksburg Defendants for excessive force, deliberate indifference, and negligence, gross negligence, and recklessness under the SCTCA. As to these claims, the magistrate judge recommends the court deny summary judgment as to Plaintiff's excessive force claim *against Janesky*, grant summary judgment as to Plaintiff's excessive force claim *against Campbell*, deny in part and grant in part the summary judgment motion as to Plaintiff's negligence claim *against the Town*, and grant summary judgment as to Plaintiff's deliberate indifference claim. (ECF No. 73). The Blacksburg Defendants objected to the magistrate judge's recommendations concerning Plaintiff's excessive force claim and negligence claim. (ECF No. 77). Plaintiff objected to the magistrate judge's recommendation concerning his deliberate indifference claim against the Town. (ECF No. 78).

14

## I.     Excessive Force

Under this § 1983 claim, Plaintiff alleges Campbell and Janesky used unnecessary and excessive force against him in violation of the Fourth and Fourteenth Amendments of the United States Constitution.[14] (ECF No. 1-1 at 7).

With 42 U.S.C. § 1983, Congress created "a private cause of action for constitutional violations by persons acting under color of state law." *Bessellieu v. S. Carolina Dep't of Corr.*, No. 8:20-cv-3130-MGL-JDA, 2021 WL 3275897, *2 (D.S.C. July 6, 2021) *adopted by* 2021 WL 3284246 (D.S.C. July 30, 2021). The statute "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). "Accordingly, a civil action under § 1983 allows 'a party who has been deprived of a federal right under the color of state law to seek relief.'" *Bessellieu*, No. 8:20-cv-3130-MGL-JDA, 2021 WL 3275897, *2 (quoting *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999)). To establish a claim under § 1983, Plaintiff must allege a violation of a right secured by the Constitution and laws of the United States and show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

"The Fourth Amendment's prohibition on unreasonable seizures includes the right to be free of 'seizures effectuated by excessive force.'" *Smalls v. Charleston Cnty. Sheriff's Off.*, No. 2:21-cv-03713-DCN-MHC, 2023 WL 6638981, at *4 (D.S.C. Mar. 28, 2023) (quoting *Schultz v.*

---

[14] Further, in addition to the arguments addressed below, in their summary judgment motion, Janesky and Campbell argue Plaintiff insufficiently pled his excessive force claim as he failed to allege any individual acts taken by either defendant. (ECF No. 62 -1 at 11). The magistrate judge found there was a sufficient record to rule on the merits, and, therefore, addressed the parties' arguments on summary judgment. (ECF No. 73 at 11-12 n.7). The undersigned will also proceed with addressing merits.

*Braga*, 455 F.3d 470, 476 (4th Cir. 2006)), *report and recommendation adopted*, No. 2:21-cv-03713-DCN, 2023 WL 5740256 (D.S.C. Sept. 6, 2023). The Supreme Court of the United States ("SCOTUS") has made clear that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis in original). Though this standard "is not capable of precise definition or mechanical application," *Bell v. Wolfish*, 441 U.S. 520, 559 (1979), "its proper application requires careful attention to the facts and circumstances of each particular case, *including* the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight," *Graham*, 490 U.S. at 396 (emphasis added). "Our inquiry into the reasonableness of the force also requires us to 'consider the facts at the moment that the challenged force was employed' 'with an eye toward the proportionality of the force in light of all the circumstances.'" *Yates v. Terry*, 817 F.3d 877, 885 (4th Cir. 2016) (quoting *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015)). "Artificial divisions in the sequence of events do not aid a court's evaluation of objective reasonableness.'" *Smith*, 781 F.3d at 101 (quoting *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005)). "Ultimately, the question to be decided is 'whether the totality of the circumstances justifie[s] a particular sort of . . . seizure.'" *Id*. (quoting *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)). "As in other Fourth Amendment contexts, . . . the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than

16

with the 20/20 vision of hindsight." *Id*. at 396. "At the summary judgment stage, once [the court has] viewed the evidence in the light most favorable to the nonmovant, the question of whether the officer's actions were reasonable is a question of pure law." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011).

### A. Excessive Force Claim as to Janesky

The magistrate judge recommends the court deny the motion for summary judgment as to this claim against Janesky, determining that "[b]ecause there is a dispute of material facts in the record as to whether Plaintiff was an immediate threat and whether the extent of his injuries indicate excessive force, . . . there are genuine issues of facts that preclude the Court from finding, as a matter of law, Janesky's conduct was objectively reasonable." (ECF No. 73 at 18). The Blacksburg Defendants object to this recommendation.[15] (ECF No. 77). Therefore, the court will provide a *de novo* review of this issue.

Initially, the court will address the force used in effectuating Plaintiff's seizure as there is a discrepancy in the record as to this issue. In his complaint, Plaintiff alleges Janesky used unnecessary and excessive force in smashing Plaintiff's window and removing him from his vehicle. (ECF No. 1-1 at 7). Elsewhere in his complaint, Plaintiff alleges he was beaten. *Id*. at 8. The evidence in this case, *interpreted in the light most favorable to Plaintiff*, establishes Janesky broke the window, pulled plaintiff out of his truck, slammed Plaintiff to the ground, struggled with Plaintiff to handcuff him, and placed his knee on Plaintiff, which Plaintiff maintains was excessive.[16] Having set forth the court's understanding of the level of force in question, the court

---

[15] Plaintiff did not file a reply to the Blacksburg Defendants' objections.

[16] Though it is unclear from the BWC footage whether Janesky ever slammed Plaintiff to the ground or kneed him during the scuffle, given the court's responsibility to interpret all evidence in favor of the nonmoving party, the lack of visibility of the entire incident in the BWC footage, *as*

will now address the circumstances surrounding this use of force to determine whether an objective officer would conclude that such force was reasonable.

### i.     Severity of the Crime

Plaintiff provides "the potential charge, which was never even served on [him], was for a property damage only hit-and-run, which is a misdemeanor." (ECF No. 67 at 12-13). Plaintiff is correct that, at the time Janesky pulled Plaintiff out of the vehicle, Plaintiff's potential charge was a misdemeanor under section 56-5-1220(A) of the South Carolina Code, and the magistrate judge cites multiple cases in his Report for the notion that minor traffic violations do not support the use of significant force. *See* (ECF No. 73 at 14) (citing *Yates*, 817 F.3d at 885 (wherein the Fourth Circuit Court of Appeals determined this factor weighed in favor of the plaintiff who, at the time of the challenged use of force, had allegedly committed only "minor traffic infractions," including speeding, playing his music too loudly in violation of a city ordinance, and changing lanes without a signal) and *Patrick v. City of Aiken*, No. 1:16-cv-03496, 2019 WL 4736453, *1, *6 (D.S.C. Sept. 27, 2019) (wherein the district court concluded this *Graham* factor weighed in the plaintiff's favor where he was involved in a hit and run *involving a fence, not an occupied vehicle*, noting "the hit and run he was involved in appears to only be a misdemeanor by virtue of there not being any evidence in the record that the act resulted in injury to a person"). *See also Baney v. Town of Chapin*, No. 3:20-cv-4313-SAL-PJG, 2023 WL 11920396, *4 (D.S.C. March 9, 2023) (determining this factor weighed in the plaintiff's favor where "the crime at issue was a *nonviolent*

---

*well as* Plaintiff's multiple statements that he was slammed to the ground, which were made immediately following the incident as well as during his deposition, the court will assume Plaintiff was slammed to the ground and that Janesky placed his knee on Plaintiff during the struggle when analyzing Janesky's use of force. Additionally, a SLED agent issued an investigative report noting, among other things, Janesky's knee was seen on Plaintiff's shoulder at the time he was being handcuffed. (ECF No. 67-11 at 8).

misdemeanor" of driving with a suspended license) (emphasis added).[17] However, contrary to Plaintiff's position, the classification of his potential charge as a misdemeanor is not the only detail relevant to the court's analysis of the severity of the crime. *See, e.g.*, *Smith*, 781 F.3d at 102 (noting the offense being investigated, contributing to the delinquency of a minor, was a "*nonviolent misdemeanor offense [that] was not of the type* that would give an officer any reason to believe that [the plaintiff] was a potentially dangerous individual") (emphasis added); *Young v. County of Los Angeles*, 655 F.3d 1156, 1165 n.8 (9th Cir. 2011) (explaining "a crime's status as a misdemeanor or felony is not the key question but rather provides a rough proxy for the true object of the court's inquiry: whether a given offense indicates a suspect's potential dangerousness, immediate or otherwise, such that there is a heightened social interest in the use of force to apprehend or subdue that suspect" and noting "[w]hile the fact that [the plaintiff] was suspected only of misdemeanor offenses weighs against a finding that the use of significant force against him was justified, *it is ultimately the nonviolent and relatively minor nature of his suspected offenses that is of more importance*") (emphasis added); *Rodriguez v. Cnty. of Los Angeles*, 654 F. Supp. 3d 1029, 1043 (C.D. Cal. 2023) (providing "[a]nd even if the crime was a misdemeanor, it was not unreasonable for police to be concerned that a hit-and-run driver may create dangers by trying to evade capture").

The crime being investigated was a hit and run resulting in property damage. Specifically, Plaintiff admits to striking *a motorcycle* with *his truck* and driving away before law enforcement arrived on the scene. It is undisputed someone was driving the motorcycle at the time of the collision. Accordingly, Plaintiff's actions demonstrated a reckless disregard for life and law and

---

[17] The parties settled the *Baney* case before the district judge ruled on the Report. *Baney*, No. 3:20-cv-4313-SAL-PJG, dkt. entry 76 (D.S.C. April 10, 2023).

19

order, and Janesky was aware of this at the time he pulled Plaintiff from the very same truck that was used to hit the motorcycle *hours before*. Though not a felony, and though Janesky testified he was aware the motorcyclist denied medical treatment before he removed Plaintiff from the vehicle,[18] "a crash involving a truck versus motorcycle could have easily cause[d] serious injury"[19] and resulted in a felony charge. The fortunate fact that the motorcyclist's health was not obviously and immediately impacted from the collision does not change that. In fact, Janesky testified that, although he knew the motorcyclist declined medical attention, he "did not know if he's just injured and still just stubborn and doesn't want to go to the hospital or what." (ECF No. 67-5 at 35, Janesky Dep. Tr. 128:16-19). Furthermore, "[t]his factor is 'intended as a proxy for determining whether "an officer had any reason to believe that the subject of a seizure was a potentially dangerous individual."'" *Payne v. Moser*, 172 F.4th 408, 416 (4th Cir. 2026) (quoting *Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 900 (4th Cir. 2016) (internal quotations omitted)). In addition to the aforementioned details surrounding the crime being investigated, at the time Janesky approached Plaintiff in his truck, Janesky was aware Plaintiff was known to be combative with law enforcement. Thus, the court finds this factor weighs in Janesky's favor.

### ii.    Whether Plaintiff was actively resisting arrest or attempting to evade arrest by flight

Hours after eluding the police following the hit-and-run with a motorcyclist, Plaintiff refused to follow numerous verbal commands to open the door even after the officers informed him they were the police and warned him that such refusal would result in Janesky breaking the window. The court is mindful of Fourth Circuit case law recognizing that an individual's "failure

---

[18] (ECF No. 62-8 at 9, Janesky Dep. Tr. 128:13-22).

[19] (ECF No. 62-21 at 18).

to exit [a] vehicle can . . . be explained by the weighty safety concerns of having to lower his hands inside the vehicle in the presence of armed and excited police officers." *Nazario v. Gutierrez*, 103 F.4th 213, 234 (4th Cir. 2024). However, once the window was broken, Plaintiff continued to resist arrest by bracing himself with his right hand on the steering wheel while Janesky was attempting to pull Plaintiff out of the truck. "By doing so, Plaintiff engaged in a level of nonviolent, active resistance," which "justified some force to overcome." (ECF No. 73 at 15). *See Nazario*, 103 F.4th at 235 (recognizing that an individual's decision to use his arm to close his vehicle's door, which the police had just opened, "was not passive or indicative of 'instinctively trying to protect himself from the Policeman's onslaught'") (quoting *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994)). Indeed, Janesky testified that, because Plaintiff was holding on to the steering wheel, Janesky had to "pull[] as hard as [he] could to separate him and [they] both went down to the ground outside of the door." (ECF No. 62-8 at 5, Janesky Dep. Tr. 86:7-12). Though the BWC footage is difficult to decipher once Plaintiff and Janesky go to the ground, it is clear from the footage that Janesky verbally directs Plaintiff to "stop resisting" and to "give [Janesky] [Plaintiff's] other hand" at this time. In short, hours after evading law enforcement following the hit and run, Plaintiff resisted law enforcement at every step.[20] Accordingly, the court agrees with the magistrate judge that this factor weighs in Janesky's favor.

---

[20] Plaintiff claims there is a "genuine dispute" as to whether he knew Campbell and Janesky were with law enforcement because he was asleep in his truck when Janesky broke his truck window, and, therefore, he did not hear Janesky and Campbell say "police," (ECF Nos. 67-14 at 18-19, McDaniel Dep. Tr. 68:21-69:21, 71:16; 89). Plaintiff testified he did not know Campbell and Janesky were the police until he was in handcuffs, claiming he was also asleep when "they pulled [him] out of the truck and everything." (ECF No. 67-14 at 24, McDaniel Dep. Tr. 90:13-21). To be certain, Plaintiff does not posit he did not know it was law enforcement because he could not see Janesky due to the flashlight in his eyes or due to it being dark. He also does not claim he did not know it was law enforcement because he did not or could not hear them announce they were the police over the officers' shouting. Instead, Plaintiff testified, under oath, that he did not know Campbell and Janesky were with law enforcement until he was in handcuffs because he was asleep

### iii.     Whether Plaintiff posed an immediate threat to the safety of the officers or others.

"Among all the *Graham* factors," whether Plaintiff posed an immediate threat to the safety of the officers or others, "is considered the most important." *Payne*, 172 F.4th at 416. Plaintiff provides he was not an immediate threat to the safety of the officers or others because he was asleep in his truck. (ECF No. 67 at 13). Though the parties do not seem to dispute Plaintiff was passed out or unconscious when law enforcement initially approached the truck, there is no dispute that Plaintiff was awake for at least forty seconds before Janesky broke the window. *Plaintiff sets forth no argument as to why he was not a threat to the safety of the officers or others after he awakened.* That said, BWC footage shows Plaintiff had his hands up for *at least* part of the time before he was pulled out of the truck, which the Fourth Circuit Court of Appeals has referred to as "the universal position of surrender." *Nazario*, 103 F.4th at 234.

In arguing Plaintiff posed an immediate threat, Janesky provides he felt threatened by, among other things, Plaintiff disobeying verbal commands and actively resisting all while knowing Plaintiff had a history of being combative. (ECF No. 62-1 at 16-17). In his deposition, Janesky explained it was dark, and he did not know if there were weapons in the vehicle. (ECF No. 67-5 at

---

until that moment. This court is mindful that it is not to weigh the evidence or make credibility determinations. *Knibbs v. Momphard*, 30 F.4th 200, 213 (4th Cir. 2022). However, "[a] plaintiff's firsthand account may . . . be discounted 'when there is evidence of undisputed authenticity that shows some material element of the plaintiff's account to be blatantly and demonstrably false such that no reasonable jury could credit the plaintiff's version of events.'" *Payne v. Moser*, 172 F.4th 408 (4th Cir. 2026) (quoting *Alexander v. Connor*, 105 F.4th 174, 179 (4th Cir. 2024)). BWC footage of the incident clearly shows Plaintiff awake at the time Janesky is seen approaching Plaintiff's truck, when Campbell and Janesky are heard identifying themselves as police officers, and while they are both wearing vests with reflective text reading "Police." Plaintiff can also be heard asking "what did I do?" (ECF No. 62-13, 0:00:16-:17). Based on the video footage, the court does not believe a reasonable jury could credit Plaintiff's assertion that he did not know it was the police knocking on his window, pulling him out of his vehicle, and struggling to handcuff him because he was asleep during the encounter.

37, Janesky Dep. Tr. 137:2-4). Nor did he know if Plaintiff was under the influence. (ECF No. 62-8 at 9, 11, Dep. Tr. 128:20-25; 130:2-4). Janesky testified there was a danger of Plaintiff running from them or running them over since Plaintiff already demonstrated he had the ability to escape earlier that day following the hit and run. (ECF No. 62-8 at 4, 10; Dep. Tr. 85:1-13, 129:6-15, 22-24). In fact, Janesky testified that, based on the way the vehicles were positioned at Bluebird Lane, Plaintiff could have driven off if he wanted to. (ECF No. 67-5 at 35-36, Dep. Tr. 130:10-19, 134:11-13). Janesky provided he was worried Plaintiff would try to get back on the road and travel into town where there were children out enjoying the festive season. (ECF No. 62-8 at 9, 11, Dep. Tr. 128:20-25; 130:2-4). Thus, he felt the first thing he needed to do was to get Plaintiff out of the vehicle, which could be a deadly weapon. (ECF No. 62-8 at 4, 10, Dep. Tr. 85:1-13, 129:6-15, 22-24). Janesky testified that once on the ground, Plaintiff continued to avoid arrest by tucking his right arm under his abdomen area. (ECF No. 62-8 at 5, Dep. Tr. 86:13-17). Having heard Plaintiff has a history of being combative, Janesky explained it was "very, very important" Plaintiff was quickly handcuffed. (ECF No. 62-8 at 5 Dep. Tr. 86:17-25). As stated, Janesky also claims Plaintiff was making furtive movements in his truck; however, those movements are not visible in the footage.

At some point during the encounter, Plaintiff is visible sitting in his truck with his hands up. Still, given the circumstances, including that the initial encounter was on the side of the road in a dark area, the officers faced a potential threat from Plaintiff, who was known at the time of the encounter to be combative with law enforcement and was behind the wheel and in control of the same locked vehicle he used in the hit-and-run from earlier that evening, the court finds this factor, *i.e.*, whether Plaintiff was an immediate threat, does not weigh in Plaintiff's favor given the legitimate safety concerns then and there existing. At best, this factor is neutral in this analysis.

23

iv.     **Extent of Plaintiff's injuries**

In addition to the aforementioned factors, the Fourth Circuit considers the extent of Plaintiff's injuries when determining the reasonableness of an officer's actions. *Hupp v. Cook*, 931 F.3d 307, 322 (4th Cir. 2019). Here, Plaintiff allegedly sustained fractured ribs, a lacerated spleen, and lung contusions. Of course, there is a dispute amongst the parties as to whether these injuries were caused by Janesky and/or Plaintiff's multiple hit-and-runs earlier that day. There is also a dispute as to whether Plaintiff put forth sufficient evidence causally relating Janesky's conduct to Plaintiff's injuries. Still, these injuries are significant, and this factor weighs in Plaintiff's favor.

However, the court's cumulative review of the *Graham* factors when measured against the level of force used against Plaintiff leads the undersigned to conclude that such force was objectively reasonable, given the totality of circumstances then and there existing at the time of Plaintiff's seizure. The court acknowledges the time period between the initial interaction between Plaintiff and Janesky prior to the use of force, and that Janesky did not provide an explanation for demanding Plaintiff open the door, even after Plaintiff asked him "what did I do?" While another officer may have given Plaintiff more time to acquiesce before employing force, that does not render Janesky's use of force unreasonable under the totality of the circumstances, particularly that Plaintiff was the suspect in a hit and run accident with a motorcyclist earlier in the evening, was known to be combative with law enforcement, engaged in active resistance prior to the use of force, and was parked in a dark, wooded area in a vehicle that was not blocked from evading officers if started. As Janesky stated during his deposition: "If we get into a negotiation, things can turn quickly. The more time that we give a suspect, to think and decide what he wants to do, the more opportunity and advantage he has over law enforcement. When you take action against someone you need to be swift." (ECF No. 67-5 at 37, Janesky Dep.

24

Tr. 137:7-12). *See also Arizona v. Johnson*, 555 U.S. 323 (2009) (recognizing "[t]raffic stops are 'especially fraught with danger to police officers'") (quoting *Michigan v. Long*, 463 U.S. 1032, 1047 (1984)).  Accordingly, the court finds that Janesky is entitled to summary judgment as to this claim.

Out of an abundance of caution, the court finds that, even if Janesky was found to have used excessive force, Janesky is entitled to qualified immunity on the excessive force claim because his conduct did not violate a clearly established constitutional right. *See Nazario*, 103 F.4th at 235-36 (recognizing that, even when an officer's use of force is constitutionally unreasonable, qualified immunity is appropriate when "the *Graham* factors do not sufficiently weigh in favor of [the plaintiff], and it is not so apparent that any reasonable officer would have realized that the force employed was excessive").

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "When police officers perform discretionary functions, the rationale in insulating officers against all but flagrant abuses of their position, is the necessity to permit police officers, especially in the context of police work, to make the appropriate decisions in an atmosphere of great uncertainty. The theory is that holding police officers liable in hindsight for every injurious consequence of their actions would paralyze the functions of law enforcement." *Williams v. Prince George's Cnty*, 685 A.2d 884, 893 (Md. Ct. Spec. App. 1996) (citing *Pinder v. Johnson*, 54 F.3d 1169, 1173 (4th Cir. 1995)). This doctrine "gives government officials breathing room to make reasonable but mistaken judgments" and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-*

25

*Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). A "court may award qualified immunity to an official if either (1) there is no violation of a constitutional right, or (2) the constitutional right was not clearly established." *Nazario*, 103 F.4th at 230. "The question of whether a right is clearly established is a question of law for the Court to decide." *Hupp*, 931 F.3d at 317-18. *See Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005) (recognizing that "the purely legal question of whether the constitutional right at issue was clearly established 'is always capable of decision at the summary judgment stage'") (quoting *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992)).

Recently, the Fourth Circuit offered the following instruction when considering whether a right is clearly established:

> [T]he Supreme Court has defined [whether a right is clearly established] by several measures. First, the right must be settled, *i.e.*, **dictated by controlling authority**. It must also not be defined at a high level of generality. Rather, **the right must be defined with such particularity as to apply clearly to the specific circumstances facing the officer**. If a court properly defines the right, the unlawfulness of the officer's conduct should "follow immediately" from the conclusion that the rule was firmly established.

> And in the context of the Fourth Amendment, "specificity" in defining the right is especially important. This is so because of the great number of variations in fact involved in seizures implicating the Fourth Amendment. Otherwise, officers will find themselves struggling to discern how the Fourth Amendment's general contours apply to the particular facts before them. **Therefore, the Supreme Court has instructed courts to identify caselaw addressing similar circumstances— cases where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment.**

> Also, as to whether the right was *clearly* established, the Supreme Court has stated that caselaw must be so clear that *every* reasonable official would understand that what he was doing was unlawful. ***It must place the constitutionality of conduct facing the officer "beyond debate."*** **Put another way, an officer is entitled to qualified immunity unless *no reasonable officer* from his vantage point could reasonably have believed that he acted lawfully**. Thus, as the Supreme Court has stated, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.

26

*Belton v. Loveridge*, 129 F.4th 271, 279 (4th Cir. 2025) (internal quotations and citations omitted) (emphasis added and in original).

Here, the court cannot find Janesky violated a clearly established constitutional right at the time of his conduct giving rise to this case. The question is whether, in October 2021, it was clearly established that an officer may not use significant force to remove an individual from a vehicle when said individual: (1) is suspected of being involved in a hit-and-run resulting in potential *bodily* injury hours before; (2) is known to be combative with law enforcement and the officer has such knowledge at the time force is used; and (3) actively, yet non-violently resists the officer's multiple commands to exit the vehicle in a dark wooded area. Plaintiff has failed to identify any existing precedent that squarely governs this case. *See Omeish v. Kincaid*, 86 F.4th 546, 557 (4th Cir. 2023) (explaining "qualified immunity kicks in 'unless existing precedent "squarely governs" the specific facts at issue'") (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)). In fact, Plaintiff does not address qualified immunity at all in his response in opposition to the pending summary judgment motions. Accordingly, having conducted its own research, with its limited resources, and finding no such authority, the court concludes that, even if Janesky's use of force was constitutionally unreasonable, Janesky is entitled to qualified immunity.[21]

### B.     Excessive Force Claim as to Campbell

The magistrate judge determined Campbell is entitled to summary judgment as to the excessive force claim because Plaintiff has failed to point to evidence showing that it was

---

[21] The court finds the facts of this case substantially different than the two cases the magistrate judge relied on in finding Janesky ineligible for qualified immunity. *See* (ECF No. 73 at 21) (citing *Smith*, 781 F.3d at 104 and *Rowland*, 41 F.3d at 172-74). In both of those cases, the offense being investigated was minor *and nonviolent* (failing to return a lost $5 bill and contributing to the delinquency of a minor), the plaintiffs were not actively resisting arrest by holding on to an object when the officer defendant employed force, and there was no evidence the plaintiffs were a danger to the police at the time of the use of force.

Campbell who used excessive force. (ECF No. 73 at 12-13). Plaintiff does not object to the magistrate judge's recommendation that the court enter summary judgment in favor of Campbell as to the excessive force claim. (ECF No. 78). Accordingly, the court must only review the magistrate judge's recommendation for clear error. Having found none, the court agrees with and adopts the magistrate judge's recommendation that summary judgment be entered in favor of Campbell.

## II.    Deliberate Indifference

Plaintiff also brought a § 1983 claim for deliberate indifference against Chief Ham, Mayor Patterson, and the Town/BPD. (ECF No. 1-1 at 8-12). As discussed, to establish a § 1983 claim, a plaintiff must identify which constitutional right was violated by the defendants' conduct. *West*, 487 U.S. at 48. Plaintiff failed to identify in his complaint which constitutional right was violated as a result of the defendants' alleged deliberate indifference.[22] That said, from reviewing the one paragraph he dedicated to this cause of action in his response in opposition to the motions for summary judgment, the court construes Plaintiff's deliberate indifference claim as asserting that Campbell and Janesky would not have violated his Fourth Amendment right to be free from seizures effectuated by excessive force but for the defendants' failure to properly train its employees and agents and enforce the Town's policies. (ECF No. 67 at 15). As stated herein, however, the court finds Plaintiff has failed to establish a Fourth Amendment violation for excessive force as to either defendant. Therefore, Plaintiff's deliberate indifference claim must likewise fail. Accordingly, the court grants the Blacksburg Defendants summary judgment as to the deliberate indifference claim. The court notes that even if it were to find Plaintiff's Fourth

---

[22] *See* (ECF No. 1-1 at 9-12) (where Plaintiff vaguely refers to the violations of his constitutional rights).

Amendment rights were violated as a result of excessive force, the court would nevertheless grant these defendants summary judgment on the deliberate indifference claim.

### A. Claims against Chief Ham and Mayor Patterson

The magistrate judge recommends the court grant summary judgment as to Plaintiff's claims against Defendant Ham and Mayor Patterson for the reasons set forth in his Report. (ECF No. 73 at 28-29). Plaintiff does not object to the magistrate judge's recommendation as to these defendants. Accordingly, finding no clear error, the court adopts the magistrate judge's recommendation and grants summary judgment in favor of Chief Ham and Mayor Patterson.

### B. Claims against the Town

The Town contends it is entitled to the dismissal of this claim because there is no evidence that any of its policies or customs were the "moving force" behind the alleged constitutional violations. (ECF No. 62-1 at 33-34). The magistrate judge recommends the court dismiss this claim against the Town, (ECF No. 73 at 30), and Plaintiff objects to that recommendation, (ECF No. 78). Accordingly, the court will review this issue *de novo*.

In *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690 (1978), the Supreme Court of the United States concluded municipalities and other local government units are "persons" under § 1983. Municipalities can be held liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury[.]" *Id.* at 690, 694. *See Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (stating "[o]nly in cases where the municipality causes the deprivation 'through an official policy or custom will liability attach'") (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)). The Fourth Circuit explained:

> A policy or custom for which a municipality may be held liable can arise in four
> ways: (1) through an express policy, such as a written ordinance or regulation; (2)

**through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."**

*Lytle*, 326 F.3d at 471 (emphasis added). "Because municipal liability results only when the municipality itself can be directly charged with fault for a constitutional violation, it results only when policy or custom as above defined is (1) fairly attributable to the municipality as its 'own,' and is (2) the 'moving force' behind the particular constitutional violation." *Spell v. McDaniel*, 824 F.2d 1380, 1386-87 (4th Cir. 1987) (internal citation omitted).

In arguing his constitutional rights were violated due to the Town's failure to enforce its policies, "Plaintiff does not identify any explicit policy or decision of the Town that caused the alleged excessive force by Janesky." (ECF No. 73 at 29). "Rather, . . . Plaintiff proceeds under theory that the Town manifested a policy or custom by omission, like failure to train, such that it constituted deliberate indifference, or through a 'persistent or widespread' practice of not enforcing policies." (ECF Nos. 73 at 29; 78 at 2). As to the "persistent or widespread" practice theory, the Fourth Circuit explained:

> "Custom and usage," in the sense of "persistent and widespread . . . practices" by municipal agents and employees, may be attributed to a municipality when the duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees. *See* [*Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984).] Actual knowledge may be evidenced by recorded reports to or discussions by a municipal governing body. Constructive knowledge may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of its official responsibilities the governing body should have known of them. *See id.*

> Similarly, where a municipal policymaker has actual or constructive knowledge of such a course of customary practices among employees subject to the policymaker's delegated responsibility for oversight and supervision, the "custom or usage" may fairly be attributed to the municipality as its own. *See id.* at 769

30

("custom" may be attributed to municipality through policymaker who has acceded to it).

*Spell*, 824 F.2d at 1387. The Fourth Circuit continued, stating:

> [A] policy or custom that is not itself unconstitutional in this strict sense must be independently proven to have caused the violation. Proof merely that such a policy or custom was 'likely' to cause a particular violation is not sufficient; there must be proven at least an 'affirmative link' between the policy or custom and violation; in tort principle terms, the causal connection must be 'proximate,' not merely 'but-for' causation-in-fact. ***Neither the existence of such a policy or custom nor the necessary causal connection can be established by proof along of the single violation charged***.

*Id.* at 1387-88 (emphasis added).

The court agrees with the magistrate judge that "Plaintiff cannot establish on this record a claim for failure to train or a persistent and widespread practice." (ECF No. 73 at 29). As stated in the Report:

> As to failure to train, Plaintiff does not present evidence in the record that the Town was aware any training was deficient. *See Connick v. Thompson*, 563 U.S. 51, 62 (2011) ("Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."). As to any widespread practice, Plaintiff has failed to point to evidence to support such claim beyond the single instance of alleged excessive force which is insufficient to show it was widespread. *See Estate of Jones v. City of Martinsburg*, 961 F.3d 661, 672 (4th Cir. 2020) ("Because *Monell* liability cannot be predicated on a theory of *respondeat superior*, a single incident is almost never enough to warrant municipal liability.") (citing *Semple v. City of Moundsville*, 195 F.3d 708, 713-14 (4th Cir. 1999) ("Proof of a single incident of the unconstitutional activity charged is not sufficient to prove the existence of a municipal custom.")). While Plaintiff contends the BPD 30(b)(6) deposition establishes "zero instances of enforcing the relevant policies that could have provided the investigation with important evidence" he does not identify these purported failures to enforce, explain how they are relevant to the underlying alleged excessive force, or show how the resulting "failure to provide the investigation with important evidence" is a constitutional violation.

*Id*. at 29-30.

Plaintiff objects to the magistrate judge's recommendation concerning the widespread and persistent practice theory, stating "[t]he Report appears to conclude that just because there was

only a single instance of alleged excessive force in the record, namely that of the Plaintiff, the unconstitutional act or omission of the Town to enforce its most important law enforcement policies was not widespread." (ECF No. 78 at 2). According to Plaintiff, "while [he] has identified a single allegation of excessive force, the Town admittedly has no records of ever reviewing its officers conduct for compliance with its BWC or Excessive Force policies." *Id*. He bases his position on the following testimony elicited during the BPD's 30(b)(6) deposition, Brian Mullinax:

> Q. Okay. Let's go back to number –topic number eight is "**Any records of investigation by the town into Campbell's compliance with the town's body-worn camera policy *on October 23, 2021*.**" **Are there any records – or was there any review conducted of what happened that night** to demine if it was in compliance with the town's body-worn camera policy?
>
> A. The only investigation I'm aware of is the one that SLED did on Campbell.
>
> Q. So the town hadn't done any investigation in the body-worn camera policy?
>
> A. No, sir, not that I'm aware of.

(ECF No. 67-9 at 12, Mullinax Dep. Tr. 37:4-16) (emphasis added).

> A. Okay. I'm just looking at the policy. Officer Campbell did not act in accordance with the policy, *if* he did not turn [the body-worn camera] on immediately.
>
> Q. Do you know if he was reprimanded at any point in time for not complying with the policy?
>
> A. I have not seen where he has been.

(ECF No. 67-9 at 14, Mullinax Dep. Tr. 46:19-47:1) (emphasis added).

> Q. Let's go back to Number 10. "Any records of *investigation by the town into Campbell's compliance with the town's response to resistance policy on October 23, 2021*."
>
> A. Not that I'm aware of.

32

(ECF No. 67-9 at 15, Mullinax Dep. Tr. 48:4-8) (emphasis added).

From this testimony, Plaintiff posits "[t]he record in this case is that Blacksburg's practices of ensuring compliance with its BWC and Excessive Force policies were (and apparently still are) non-existent. The record shows no effort to ensure policy compliance." (ECF No. 78 at 4). According to Plaintiff, such noncompliance "can only be considered the epitome of 'deliberate indifference'" and that it was inevitable that one or both of these policies would be violated. *Id*. at 4-5. Plaintiff, however, interprets the evidence too broadly.  The aforementioned testimony was limited to investigations concerning the specific incident *that gave rise to this case*. Mullinax was not asked about whether the Town *ever* engaged in any investigation or review into the Town's employees' compliance with its BWC or Excessive Force policies *before this case* to support a finding that  the BPD's failure to enforce its policies was persistent and widespread issue at the time force was used in this case, and, as the Fourth Circuit explained in *Spell*, evidence of a municipality's failure to enforce its policy in one instance, is insufficient to establish widespread and persistent use.[23] Further, while Plaintiff notes that Janesky, a state constable, testified he was operating under SLED policies, not the Town's policies, and that the Town never asked him to review its policies, (ECF No. 78 at 3), Plaintiff fails to explain how this detail is sufficient to establish (1) a policy or custom that can be fairly attributable to the municipality as its own; and (2) that such policy and custom inflicted, or was the moving force behind, any violation of Plaintiff's constitutional rights. As such, the court adopts the magistrate judge's recommendation and grants summary judgment in favor of the Town as to this claim.

---

[23] Plaintiff failed to mention that Mullinax also testified Sergeant Holland periodically reviews body camera footage to confirm his officers are complying with the policy. (ECF No. 67-9 at 22, Mullinax Dep. Tr. 76:9-14).

**III.     Negligence, Gross Negligence, and Recklessness Cause of Action Against the Town**

In its order at ECF No. 82, the undersigned determined that, for reasons discussed therein, Plaintiff's sole remaining claim against the Blacksburg Defendants should be remanded to state court. Because the court denies Plaintiff's request to reinstate his § 1983 causes of action, and because Plaintiff sets forth no argument for why this court should retain jurisdiction over his remaining state law cause of action, the court finds no reason to deviate from its decision to remand Plaintiff's SCTCA claim. Accordingly, such claim is hereby remanded.

For the reasons set forth herein, the court **GRANTS IN PART** and **DENIES IN  PART** Plaintiff's motion for reconsideration. (ECF No. 89). Plaintiff's request that the court reconsider the grant of summary judgment in favor of the Blacksburg Defendants on his § 1983 claims is **GRANTED**. However, having reconsidered the matter as requested, the court **DENIES** Plaintiff's request that the court reinstate his claims under 42 U.S.C. § 1983. Though the court's disposition of the Blacksburg Defendants' summary judgment motion and its decision to remand the SCTCA claim to state court ultimately remains unchanged, the court directs the Clerk of Court to provide a copy of this order to the Cherokee County Clerk of Court.

**IT IS SO ORDERED.**

s/Timothy M. Cain
Chief United States District Judge

Anderson, South Carolina
June 5, 2026

**NOTICE OF RIGHT TO APPEAL**

The parties are hereby notified of the right to appeal this order pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure.